Anderson L. McGINNIS, Delia McGinnis, and Pan American Petroleum Corporation, a corporation, Appellants (Plaintiffs below),

v.

GENERAL PETROLEUM CORPORATION, Western Oil Refining Company, Pfaff-Quealy Corporation, Belfer Corporation and Belco Petroleum Corporation, all corporations, and Belfer Natural Gas Company, a partnership, Appellees (Defendants below).

No. 3130.

Supreme Court of Wyoming.

Sept. 13, 1963.

Albert E. Nelson, Nelson & Jackson, Rock Springs, for appellants.

A. G. McClintock, Cheyenne, and James E. Horigan and Burns H. Errebo, Denver, Colo., for appellees.

Before PARKER, C. J., and HARNSBERGER, GRAY and McINTYRE, JJ.

Mr. Chief Justice PARKER delivered the opinion of the court.

The McGinnises, admittedly the fee owners of tract 49, secs. 27 and 28, T. 28 N., R. 113 W., sixth principal meridian, Sublette County, Wyoming, and the Pan American Petroleum Corporation, allegedly their lessee, filed a complaint in the district court in two counts: First seeking to quiet title against defendants and second asking for declaratory judgment determining the present interests of the parties in the oil and gas rights in the land. Defendants, making certain admissions of facts, denied generally and counterclaimed, seeking to have their respective interests declared valid and title quieted against the claimed Pan American lease. The case was tried by the court on the pleadings, agreed statement of facts, and stipulation of the parties without the introduction of testimony. A judgment for the defendants and against plaintiffs has resulted in this appeal.

Briefly stated, the controversy arises from the fact that the McGinnises on July 30, 1947, executed a five-year lease to Western Oil Refining Company, therein agreeing, among other things, that lessee would have a right to unitize. On November 1, 1947, lessors executed with Western and others a unit agreement. During the period July 20, 1947, through and including July 25, 1952, Western annually made rental payments in the amount of $160 to the McGinnises, but thereafter until December 29, 1953, no rentals were paid or tendered. The McGinnises considered the Western lease to be in default and on December 21, 1953, executed another with Stanolind, predecessor of Pan American, and on May 20, 1958, a renewal was executed by the McGinnises and Pan American. Meanwhile on October 8, 1952, an agreement had been made between the McGinnises and Western, purporting to make the understanding of the parties "definite and certain," in which it was said that the July 30, 1947, lease was declared extended to the full life of the unit agreement and that "Lessee shall continue to pay rentals under provision of paragraph 4 of said lease until the lands hereinabove described are made a part of a 'Participating Area' under such unit agreement, or are receiving royalties for the production of Oil or Gas."

Plaintiffs state that the sole issue is whether the 1947 Western lease terminated as provided in paragraph four thereof when the delay rental was not tendered on the due date. Defendants take exception to the plaintiffs' use of the phrase "delay rental payable," but agree that the issue is whether the lease terminated at that time and state the basic issues to be whether there was an obligation to make any payment in July 1953 and, if so, whether the failure to pay was merely a breach of covenant and not the occurrence of a condition limiting and automatically terminating the lease.

Under the arguments presented, two paragraphs of the 1947 lease are of special significance:

"4. If operations for the drilling of a well for oil or gas are not commenced on said land on or before one year from this date, this lease shall terminate as to both parties, unless the lessee shall, on or before one year from this date, pay or tender to the lessor or for the lessor's credit in First National Bank at Kemmerer, Wyoming, or its successor or successors, which bank and its successors are lessor's agents and which shall continue as the depository regardless of changes in the ownership of the land, the sum of .... One Hundred Sixty.... Dollars which shall operate as a rental and cover the privilege of deferring the commencement of operations for the drilling of a well ..e year from said date. In like manner and upon like payments or tenders the com-

mencement of operations for the drilling of a well may be further deferred for like periods successively during the primary term of this lease. * * * "

"12. Lessee shall have the right to unitize, pool, or combine all or any part of the above described lands with other lands in the same general area by entering into a cooperative or unit plan of development or operation approved by any governmental authority and, from time to time, with like approval, to modify, change or terminate any such plan or agreement and in such event the terms, conditions and provisions of this lease shall be deemed modified to conform to the terms, conditions and provisions of such approved cooperative or unit plan of development or operation and, particularly, all drilling and development requirements of this lease, express or implied, shall be satisfied by compliance with the drilling and development requirements of such plan or agreement, and this lease shall not terminate or expire during the life of such plan or agreement. * * * "

The following portions of paragraphs seven and sixteen of the unit agreement are likewise important here:

"The development and operation of land subject to this agreement under the terms hereof shall be deemed full performance by the Unit Operator of all obligations for such development and operation with respect to each and every part or separately owned tract of land subject to this agreement, regardless of whether there is any development of any particular part or tract of the unit area, notwithstanding anything to the contrary in any lease, operating agreement, or other contract by and between the parties hereto or any of them."

"The parties hereto holding interests in land within the unit area other than Federal land consent and agree, to the extent of their respective interests, that all leases or other contracts concerning such land shall be modified to conform to the provisions of this agreement and shall be continued in force and effect during the life of this agreement."

It cannot go unobserved that the recited concessions granted by the McGinnises in these two instruments were not inconsiderable, and there is no contention that at the time of the signing they were misled, uninformed, or coerced.[1]

Plaintiffs' basic contention is that under paragraph four of the lease, which they call the "unless clause," the lease automatically terminates in the absence of production upon the failure of lessee to pay or tender rentals in due time or to conduct drilling operations; that the unless clause controls; and that the unit agreement has no force and effect here. Plaintiffs point out that they voluntarily executed the unit agreement and insist that therefore the unitization was not in pursuance of paragraph twelve of the lease, which paragraph was never pertinent to this controversy. Plaintiffs also insist that the above-quoted provision of paragraph seven of the unit agreement means drilling and development directly benefiting their acreage because such activities under the lease are for the direct benefit of the land covered and according to the unit arrangement must likewise benefit their land. Additionally, they urge that such provision has no effect on the lease because there are no express obligations for development or operation in the lease and seek to bolster this point by quoting Summers and Williams:

"Where the unless drilling clause is used the lessee does not expressly covenant to drill a well on the land.

1. Counsel in argument now say that the McGinnises have no recollection of delivery to them of a copy of the unit agreement and intimate that only signature pages may have been circulated for the parties to sign, but this is without force as being contrary to the agreed statement of facts and their pleadings.

* * *" 2 Summers, Oil and Gas, p. 514 (1959).

" * * * the 'unless' clause does not contain any covenant by the lessee. He is not obligated by this clause to do anything. * * *" 3 Williams, Oil and Gas Law, p. 145 (1962).

Plaintiffs say that under existing legal principles the intention of the parties to the agreement is manifested by the language they use, Skelly Oil Co. v. Wickham, 10 Cir., 202 F.2d 442; Pilcher v. Hamm, Wyo., 351 P.2d 1041; Barlow v. Makeeff, 74 Wyo. 171, 284 P.2d 1093; that such intent is controlling and will be adopted when the parties have acted in good faith upon such interpretation, Hill v. Stanolind Oil & Gas Co., 119 Colo. 477, 205 P.2d 643; and these principles are not challenged. They urge that an agreement must be construed strictly against the lessee and in favor of the lessor, and insist that this is particularly true in the instant case because of actions of Western in paying the rentals regularly from 1947 to 1952 and sending letters of explanation concerning such payments. They maintain that the October 8, 1952, agreement confirmed the understanding of the parties that the primary term was extended to coincide with the unit agreement if the rentals were paid pursuant to section four of the lease until the McGinnises could participate in production and expressly continued in effect all of the other lease provisions. Moreover, plaintiffs insist that the interpretation for which they contend is equitable and fair and that any other would lead to extremely harsh results.

On the other hand, defendants' position is that while the first instrument was an "unless" lease and standing alone this automatically terminated on any anniversary date of the primary term unless drilling operations were then in progress or delay rentals paid the unit agreement naturally modified the "unless" provision, the effect of the combined lease and unit agreement being that whereas there had existed a number of separate leases on separate lands with various lessees and lessors and separate obligations the unit agreement consolidated these so that the drilling obligations of the lease in this instance were satisfied by operations on any land within the unit area, and that accordingly there was no obligation of the lessee to pay delay rentals under the McGinnis lease as long as there were drilling operations on any part of the unit area. They aver that the effect of the October 8, 1952, agreement must be considered in the light of these circumstances and since it merely confirmed what was already true as a matter of law, i. e., the lease had been extended by and for the life of the unit agreement, any separate promise made therefor was without consideration and unenforceable, and that the agreement did not purport to separate the lease from the unit agreement or change the force of the latter, and even if it should be determined that there was consideration for the October 8 agreement between the McGinnises and Western, other parties had an interest in the lease and their rights could not be altered.

We examine then these contentions and arguments of the parties, accepting plaintiffs' unchallenged statement of principle that the intent of the parties to the agreements is manifested by the language they used and that such intent is controlling and will be adopted when the parties have acted in good faith upon such interpretation. As to plaintiffs' argument that oil and gas leases are to be construed most strongly against lessee and in favor of lessor, the authorities they cite for this point would seem to bear them out only to the extent of the often enunciated rule that a contract is construed most strongly against the parties who drafted it. Tauer v. Williams, 69 Wyo. 388, 242 P.2d 518, 525. In the present case it is clear beyond question that the instruments signed by the McGinnises and Western must be considered in the light of all provisions contained in any of them. When so viewed, some of the arguments presented fall of their own

weight, e. g., plaintiffs' insistence that defendants had no obligation under the lease to drill a well or pay rentals and that such instrument was therefore not affected by the unit agreement. In so doing they do not have paragraph twelve of the lease in the proper perspective, "all drilling and development requirements of this lease, express or implied, shall be satisfied by compliance with the drilling and development requirements of such plan or agreement." Certainly, the parties would not have inserted such provision without intending it to have had some meaning; and there would seem to be no reason to go beyond the fair import of the words used, namely, that paragraph four of the lease contained an obligation or requirement within the meaning of paragraph twelve. A like interpretation would apply to paragraph seven of the unit agreement between the parties. In that connection, we doubt the applicability of the above-mentioned quotation from Summers upon which plaintiffs rely since that discussion does not purport to deal as here with a lease containing paragraphs permitting unitization and the modification of the lease to conform with the unit agreement.

Plaintiffs' assertion that the unit agreement is not pertinent to this controversy scarcely bears scrutiny. They insist that:

"* * * [paragraph 12 of the lease] provides that all drilling and development requirements of the lease will be satisfied by the drilling and development requirements of the unit agreement, meaning *necessarily*, drilling and development directly benefiting the leased acreage, because drilling and development under the lease are for the direct benefit of the land covered thereby, so that drilling and development under the unit agreement, made in substitution thereof, likewise must benefit the land covered by the lease to the end that all or part of such land is included in a participating area; and it provides for payment of royalty to the lessor on the basis of allocated rather than actual production. * * *"

This statement is wholly unsupported by precedent, and we consider it to be ipse dixit.

■ We pass then to the argument that the actions of Western in paying the rentals over a five-year period and in sending letters concerning such payments have a bearing on the parties' interpretation of the contract. We think they do, and had this conduct not been explained by the October 8, 1952, agreement, it would be difficult to understand why the payments were made since under the lease and the subsequent unit agreement there was no legal obligation for lessee to pay any amounts to keep the lease alive so long as the drilling and development obligations were being accomplished in a part of the unitized area. Whether or not there was some oral understanding or some interpretation by plaintiffs which was adopted by Western is not clear, and the point creates some confusion in a consideration of the matter. In any event, the situation must have been obscure enough to bring about the agreement of October 8, 1952, which purported "to make the understanding of the parties definite and certain." This statement in itself implies that there had been some understanding which as far as the record was concerned was insufficient to create a legal obligation. By that instrument Western was required to make annual payments until the lessors' land was in a participating area or receiving royalties from the production of oil or gas. On the face of the instrument the term "rentals" was not employed in the usual sense of the dictionary definition but rather as money in lieu of royalties. When the parties took the trouble to execute a new instrument for the purpose of clarity, it is reasonable to assume that had they intended a forfeiture for the nonpayment of the "rentals" this would have been said.

■ The reluctance of courts in this jurisdiction to declare forfeitures on contracts which are indefinite as to the right

therefor was well illustrated in Phillips v. Hamilton, 17 Wyo. 41, 95 P. 846, 848, where it was said:

"* * * It is at least doubtful if a breach of such an implied covenant would warrant the court in decreeing a forfeiture when the lease does not expressly so provide * * *."

In their reply brief, plaintiffs discuss a postulate that the unit here was of a "divided" type and that this fact was an additional reason for alleged error. The point was not raised in the original brief or argument and apparently was not presented to the trial court; there is nothing in the record or the matters submitted which would warrant a decision in plaintiffs' favor on this basis.

█ Something should perhaps be said about the hypothesis of plaintiffs that the interpretation given by the trial court was inequitable, unfair, and would lead to extremely harsh results. We are doubtful that such assumption is warranted from a consideration of all facts presented in the record and reasonably implied therefrom. It is true that if the McGinnises' property had been in a proven area where oil and gas could be produced at no great depth, a result such as the holding here would not have been fair to the lessors. On the other hand a reasonable assumption from all facts before us is that there was no positive knowledge of the existence of oil and gas in paying quantities in the area at the time of the execution of the lease and the unitization and that there would have been slight interest in the land in question until the development and proof of the area. In any event, as was said in Phillips v. Hamilton, supra, 95 P. at 848, "it is not the duty of the court to make contracts for the parties, but to interpret the language they have used and to construe the contract they have entered into according to established legal principles."

The judgment of the trial court should be affirmed.

Affirmed.