James A. **WOLFF**, Appellant (Plaintiff),

v.

**BELCO DEVELOPMENT CORPORA-TION, Gulf Oil Exploration & Production Company, a division of Gulf Oil Corporation, Chevron, U.S.A., Inc., All Minerals, Inc., and Pendleton Land & Exploration, Inc., Appellees (Defendants).**

No. 86–201.

Supreme Court of Wyoming.

May 6, 1987.

Neil J. Short of Ross & Short, Casper, for appellant.

Thomas Reese of Brown, Drew, Apostolos, Massey & Sullivan, Casper, for appellees.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

CARDINE, Justice.

This is a quiet title action in which appellant, who owns two-thirds of the mineral estate underlying a tract of land in Campbell County, Wyoming, sought a judicial declaration that appellees' oil and gas leasehold interests in a portion of those lands had expired. The district court found that, under the terms of the oil and gas lease and a subsequent communitization agreement, production on a communitized area which included part of the leased area kept the entire lease in force. The single issue before us on appeal is whether the district court erred in reaching this conclusion and granting summary judgment for appellees.

We affirm.

Appellant is the owner of the mineral estate underlying approximately 803 acres of Campbell County land. By an oil and gas lease executed January 5, 1967, appellant's predecessor in interest leased the lands to appellees' predecessor in interest. The lease contained a standard habendum clause which provided that "[i]t is agreed that this lease shall remain in force for a term of Ten years from date, and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee, its successors and assigns." A pooling clause was stricken from the lease.

On November 12, 1971, appellant and his predecessor in interest executed a communitization agreement which committed 40 acres of the leased land to an 80–acre communitized area.[1] The remaining 40 acres of the communitized area consisted of federal mineral acreage. The communitization agreement contained the following provisions:

"WHEREAS, the Act of February 25, 1920, 41 Stat. 437, as amended by the Act of August 8, 1946, 60 Stat. 950, 30 U.S.C. Secs. 181 et seq., authorizes communitization or drilling agreements communitizing or pooling a Federal oil and gas lease, or any portion thereof, with other lands, whether or not owned by the United States, when separate tracts under such Federal lease cannot be independently developed and operated in conformity with an established well-spaced program for the field or area and such communitization or pooling is determined to be in the public interest; and

"WHEREAS, the parties hereto own working, royalty or other leasehold interests, or operating rights under the oil and gas leases and lands subject to this agreement which cannot be independently developed and operated in conformity with the well-spacing program established for the field or area in which said lands are located; and

"WHEREAS, the parties hereto desire to communitize and pool their respective mineral interests in lands subject to this agreement for the purpose of developing and producing communitized substances in accordance with the terms and conditions of this agreement:

"NOW, THEREFORE, in consideration of the premises and the mutual advantages to the parties hereto, it is mutually covenanted and agreed by and between the parties hereto as follows:

"1. The lands covered by this agreement (hereinafter referred to as 'communitized area') are described as follows: W ½ SE ¼ of Section 6, Township 54 North, Range 73 West, Campbell County, Wyoming

"Containing 80.00 acres, more or less, and this agreement shall include only the Muddy formation underlying said lands and the crude oil and associated gaseous

1. Rocky Mountain Mineral Law Foundation, Law of Federal Oil and Gas Leases (1986), defines "communitization" as:

"Communitization, or pooling as it is usually called where nonfederal lands are involved, is

the agreement to combine small tracts for the purpose of committing enough acreage to form the spacing and proration unit necessary to comply with the applicable state conservation requirements." Id. at § 18.01[2].

hydrocarbons, hereinafter referred to as 'communitized substances' * * *.

"2. Attached hereto, and made a part of this agreement for all purposes, is Exhibit A designating the operator of the communitized area and showing the acreage, percentage and ownership of oil and gas interests in all lands within the communitized area, and the authorization if any, for communitizing or pooling any patented or fee lands within the communitized area."

The communitization agreement further provided:

"6.(a) The royalties payable on communitized substances allocated to the individual leases comprising the committed area and the rentals provided for in said leases shall be determined and paid on the basis prescribed in each of the individual leases. Payment of rentals under the terms of leases subject to this agreement shall not be affected by this agreement except as provided for under the terms and provisions of said leases or as may herein be otherwise provided. Except as herein modified and changed, the oil and gas leases subject to this agreement shall remain in full force and effect as originally made and issued.

＊　　＊　　＊　　＊　　＊　　＊

"8. The commencement, completion, continued operation or production of a well or wells for communitized substances on the communitized area shall be construed and considered as the commencement, completion, continued operation or production on each and all of the lands within and comprising said communitized area, and operations or production pursuant to this agreement shall be deemed to be operations or production as to each lease committed hereto."

After this communitization agreement had been executed, commercial production was obtained from a well located on the 40 acres of federal mineral acreage committed to the agreement. Appellant received royalties as a result of production from that well.

In March, 1986, appellant initiated the present action seeking to quiet title to that portion of his lands included in the lease but not committed to the communitization agreement. Appellant contended that production on the communitized area should not be considered to be production on the remainder of the leased acreage and therefore, with respect to that remaining acreage, the lease had expired. The district court rejected appellant's contentions and granted summary judgment in favor of appellees.

The parties agree that the disposition of this case is governed by principles of contract law.

" 'Our basic purpose in construing or interpreting a contract is to determine the intention and understanding of the parties. If the contract is in writing and the language is clear and unambiguous, the intention is to be secured from the words of the contract.' " (Citations omitted.) *Rouse v. Munroe*, Wyo., 658 P.2d 74, 77 (1983) (quoting *Amoco Production Company v. Stauffer Chemical Company of Wyoming*, Wyo., 612 P.2d 463 (1980)).

■ Appellant presents two alternative theories. The first is that the lease and unitization agreement form a contractual scheme that is clear and unambiguous and that "principles of common sense and good faith require a finding that only forty acres * * * included in the Oil and Gas Lease are held by production under the Communitization Agreement." Appellant's second theory is that if the contractual scheme is ambiguous, any ambiguity must be resolved against appellees, the drafters of the communitization agreement.

We agree with the proposition that both documents must be read together as forming the contract between the parties. See *Busch Development, Inc. v. City of Cheyenne*, Wyo., 645 P.2d 65, 68, 70 (1982). According to appellant, ambiguity arises from the fact that the pooling clause was stricken from the 1967 lease. Appellant suggests that the striking of that clause indicates "that the Lessors would not take great pains to strike the Pooling Clause in the Lease only to completely reverse their position approximately four years later." The clear terms of the communitization

agreement, however, demonstrate that the lessors did reverse their position. Paragraph 6(a) provides that *"[e]xcept as herein modified and changed,* the oil and gas leases subject to this agreement shall remain in full force and effect as originally made and issued." (Emphasis added.) Paragraph 8 of the agreement states that production on the communitized area "shall be construed and considered as * * * production on each and all of the lands within and comprising said communitized area" and that "production pursuant to this agreement shall be deemed to be * * * production as to *each lease committed hereto."* (Emphasis added.) Attached to the communitization agreement is "Exhibit A" which is entitled "Description of Leases Committed." This document identifies the 1967 lease as a lease committed to the agreement.

Once the communitization agreement was executed, the striking of the pooling clause in the 1967 lease became irrelevant. The written terms of the contract and specifically paragraph 8 constitute a clear and unambiguous expression of the parties' intent that production on the communitized area would hold the entire leased acreage.

Appellant further contends that since the communitization agreement describes only the 40–acre tract of appellant's land, only those 40 acres are affected by the agreement. In support of this argument, appellant cites *Hartman v. Potter,* Utah, 596 P.2d 653 (1979), a case which addresses the problem of ascertaining the intent of the grantor of a deed. In that case, the court said: "[t]he description of the property in a deed is prima facie an expression of the intention of the grantor." Id. at 656. In this case, however, the communitization agreement, by its terms, affects both the *lands* described as being committed to the communitization area and each *lease* committed to the agreement.

This case was presented to both the trial court and this court upon the parties' agreement that upon undisputed facts the only issue was one of interpretation of the parties' contract. There was no claim that the leased area might be drained by pro-

duction from the communitized area. If such claim is ever made, appellant is amply protected by the implied covenant of reasonable development and the implied covenant against drainage. See *Clovis v. Pacific Northwest Pipeline Corporation,* 140 Colo. 552, 345 P.2d 729, 731 (1959). The fact that in two cases cited the party claiming drainage did not prevail is of no import. In all cases one party prevails, the other loses, usually because they simply did not satisfy the burden of persuasion.

Affirmed.

URBIGKIT, J., filed a dissenting opinion in which MACY, J., joined.

URBIGKIT, Justice, dissenting, with whom MACY, Justice, joins.

By appeal, this court now considers a 1967 fee oil and gas lease of 803.24 acres, of which 40 acres was pooled with an adjoining 40–acre federal lease to establish a drilling unit. The well was drilled on the federal lease component in 1971, and since 1972 has been a producing well. No demonstrated explanation or production effort under the lease was ever made on any of the leased premises during the 20–year period, now 10 years past the stated expiration date.

The original lessor was appellant's father, and appellant is the present owner of a two-thirds mineral interest. The lease included lands located in both Townships 54 and 55, approximately divided with a portion of the lease in Section 6, Range 73 West, Township 54 North, and the balance in Township 55 North. The drilling site was under a federal lease in the W½NE¼, Section 6, and the portion of the remaining lease in that section is still in contest and is subject to the 1967 lease under claims of defendants Belco Development Corporation, Gulf Oil Exploration & Production Company, and Chevron, U.S.A., Inc. The lands in Township 55 North had been abandoned or released. Consequently at issue is the present validity of the 1967 lease as to the NW¼, Lots 3, 4, and 5, and the SE NW, Lots 1 and 2, (N½NE¼) S½NE¼ NE¼SE¼ NE¼SW¼, Section 6, Township 54 North, Range 73 West.

The original fee oil and gas lease document, in typical oilpatch printed form, included a pooling clause *which was expressly deleted in execution.*[1] Neither the resulting lease after deletion of the pooling clause, nor the subsequently executed pooling agreement for the well site included a Pugh clause. 4 Kuntz, Law of Oil and Gas, § 48.4 at 225 (1972); Comment, *The Effect of Unitization on the Duration and Extent of Mineral Interests in Louisiana*, 36 Tul.L.Rev. 769 (1962); Moses, *Some Comments on the 'Pugh' Clause in Louisiana Oil and Gas Leases*, 37 Tul.L.Rev. 269 (1963). Obviously, the clause was not necessary with deletion of the lease term, and it was not considered in the pooling agreement when the agreement was tendered to the uninformed lessor by the oil company representative.

## INTENT OF THE PARTIES

In 1971, the agreement, which is designated by loose terminology as a communitization agreement and is in fact a pooling agreement[2] for well site, was executed. It is from the pooling-agreement terminology that the first issue is developed.

That decision encompasses consideration whether the language of the pooling agreement is sufficiently clear or subject to a

1. "Lessee is hereby granted the right and power to pool or combine the acreage covered by this lease, or any portion thereof, with other land, lease or leases in the vicinity thereof at any time and from time to time, whether before or after production, when in Lessee's judgment it is necessary or advisable to do so for the prevention of waste and the conservation and greatest ultimate recovery of oil or gas. Such pooling shall be into a unit or units not exceeding in area the acreage prescribed or required in any Federal or State law, order, rule or regulation for the drilling or operation of one well, or for obtaining the maximum allowable production from one well, or 40 acres each for the production of oil, or 6–10 acres each for the production of gas, whichever is the larger, plus a tolerance over the maximum area of 40 acres for the production of oil or 6–10 acres for the production of gas to include additional acreage in any irregular governmental subdivision or lot or portion thereof. Such pooling shall be effected by Lessee's executing and filing in the office where this lease is recorded an instrument identifying and describing the pooled acreage. The production of pooled substances and development and operation on any portion of a unit so pooled, including the commencement, drilling, completion and operation of a well thereon, shall be considered and construed, and shall have the same effect, except for the payment of royalty, as production, development and operation on the leased premises under the terms of this lease. The royalties herein provided shall accrue and be paid to Lessor on pooled substances produced from any unit in the proportion, but only in the proportion, that Lessor's acreage interest in the land covered hereby and placed in the unit bears to the total acreage in the land placed in such unit."

2. Mischaracterization is frequently found in text and cases as to the terminology of pooling and unitization. Knowledgeable authorities define unitization to invoke the producing area as for example, the field encompassing the producing zones. Contrarily, a pooling agreement involves the lands necessary to secure a drilling site within acreage limitations in field allocations. It is not unusual to have pooling agreements which later become part of a unitized area. Communitization as a term not normally used is somewhat similar to pooling as derived from 30 U.S.C. 226(j), and there used in the disjunctive as "communitization or drilling agreements." A drilling agreement may be but sometimes is not the same as a pooling agreement:

   "The terms 'pooling' and 'unitization' are not words of art. In many of the statutes, court decisions, and other legal articles on this subject, the reader will find references to such terms as pooling, unitization, communitization, integration, consolidation, etc. All of these terms refer to a single legal result where the interests of the parties are consolidated into a single unit for cooperative development and production so that all parties will share, in proportion to their respective interests, in all oil or gas produced from the unit, regardless of the particular tract within the unit from which the production might be obtained. For convenience, the terms used in this article to describe such legal result will be confined to the terms 'pooling' and 'unitization.' Where appropriate, the pooling or unitization under discussion will be identified as being either 'voluntary' or 'compulsory.'
   "*Pooling—Unitization*
   "The term 'pooling' will be used in this article to refer to the consolidation of royalty interests, or working interest, or both, into a small unit for the drilling of a single well or a limited number of wells. The term 'unitization' will be used to refer to the consolidation of royalty interests, or working interests, or both, into a large unit that may cover an entire pool or a substantial portion of a pool." Twenty-Third Annual Institute on Oil and Gas Law and Taxation at 146–147 (1972).

sufficiently clear understanding by the layman landowner to fairly communicate an intended burden upon his land, or conversely, is the language ambiguous or subject to fraudulent criteria so that an issue of fact upon oral evidence is presented as a defense to summary judgment? In a recent case this court examined the relationship between parol evidence and written-agreement provisions. *Cordova v. Gosar*, Wyo., 719 P.2d 625 (1986).

The 1971 80-acre pooling agreement, ¶ 6 in part provided:

"6. (a) The royalties payable on communitized substances allocated to the individual leases comprising the communitized area and the rentals provided for in said leases shall be determined and paid on the basis prescribed in each of the individual leases. Payment of rentals under the terms of leases subject to this agreement shall not be affected by this agreement except as provided for under the terms and provisions of said leases or as may herein be otherwise provided. Except as herein modified and changed, the oil and gas leases subject to this agreement shall remain in full force and effect as originally made and issued."

Thereafter, ¶ 8 provided:

"8. The commencement, completion, continued operation or production of a well or wells for communitized substances on the communitized area shall be construed and considered as the commencement, completion, continued operation or production on each and all of the lands within and comprising said communitized area, and operations or production pursuant to this agreement shall be deemed to be operations or production as to each lease committed hereto."

I do not find this language to be so clear and definite that the landowner is not entitled to rely on what he was told in explanation by the oil company representative when tender for execution was made. Compare *McGinnis v. General Petroleum Corp.*, Wyo., 385 P.2d 198 (1963), where both a lease pooling clause and a subsequent confirmation agreement were executed.

Utilization of the case law rules on off-site attribution of pooled production for nonincluded acreage as later to be discussed under the logic of "attribution of off-site production" in this case, as a status-of-the-law inquiry, should be differentiated from a decision derived from an interpretation of the agreement of the parties in definition of the actual language of the written documents. One would be pressed as a layman to know that the off-premises production by the pooling agreement terminology meant that the lessee would be protected for the next 15 years by external production sufficient to internally extend the lease beyond its stated term even if the lessee never pursued any development work on any of the lease. *Meuse-Rhine-Ijssel Cattle Breeders of Canada Ltd. v. Y Tex Corp.*, Wyo., 590 P.2d 1306 (1979). Certainly it is not clearly said like it was otherwise provided for in the stricken lease clause quoted in fn. 1, where the provisions did not include the limitation clause language of "on each" and "within."

We have a factual case where the attribution clause as a pooling provision has been expressly deleted from the lease, and the pooling agreement now says:

"Payment of rental under the terms of leases subject to this agreement shall not be affected by this agreement except as provided for under the terms and provisions of said leases or as may herein be otherwise provided."

Having recognized that the lease remains unaffected in ¶ 6, we examine ¶ 8 to unearth an exception which would *amend ¶ 6 of the pooling agreement and reinstate the stricken clause of the lease itself.* The language provided to do this dirty work, if done, is:

"* * * [S]hall be construed and considered as the commencement, completion, continued operation or production on each and *all of the lands within* and comprising said communitized area." (Emphasis added).

I do not think the job got done.

The majority have determined that off-premises production is somehow, in the face of ¶ 6, to be considered by clear inter-

pretation to be premises production for the purpose of continuation of the lease beyond a term, and then state that the construction is clearly expressed as the intention of the parties. Again, I do not agree. The parties' original intention was clear from the deletion of the lease pooling clause. Production as defined in the lease would not be attributable by off-site development. A contrary specificity cannot be found in the subsequent pooling agreement. Furthermore, I would find that exclusion of parol evidence of what the oil company representative told the owner as to the meaning of the terminology is patent error. *Rouse v. Munroe*, Wyo., 658 P.2d 74 (1983). If, as now interpreted, it was then to be intended, it was at best to be described as a misstatement, and at worst to be an intentional lie.[3]

"4. In 1971 our family was approached by the oil companies about pooling forty acres of the lands in the Lease (Exhibit 1) with forty acres of minerals owned by the Federal Government to form a spacing unit for a well drilled on the Federal minerals. After quite a bit of talk about this, we agreed to allow forty acres of our minerals to be pooled with the Federal minerals with the understanding that only that forty acre tract would be tied up in the agreement that the balance of the lands in the Lease (Exhibit 1) would not be held by the pooling. The lands which we agreed could be pooled are described as follows:

*"Township 54 North, Range 73 West, 6th P.M.*
Section 6: NW¼SE¼"
Affidavit of James A. Wolff.

A summary-judgment disposition pursuant to the parol-evidence rule is not justified in any reasoned evaluation of these oil-company prepared documents or this summary-judgment record. *Cordova v. Gosar*, supra; *Meuse-Rhine-Ijssel Breeders of Canada Ltd. v. Y Tex Corp.*, supra.

## ATTRIBUTION OF OFF–SITE PRODUCTION ON POOLED ACREAGE

With this court's refusal to recognize the significance of the original deletion of the lease pooling clause, the remaining major issue of this appeal is whether a legal presumption is applied to the contractual effect as a principle of administration and interpretation. Two lines of authority on the issue have developed. What could be characterized as the Louisiana rule, more recently found in Colorado in *Clovis v. Pacific Northwest Pipeline Corp.*, 140 Colo. 552, 345 P.2d 729 (1959), holds that pooled or unitized production, where only a portion of a lease is committed, will serve under the lease terminology to hold the entire lease beyond term.[4] The other rule, which can be described as the Mississippi principle, although clearly a minority position, is contrary in denying retention of

---

**3.** For the purposes of present summary-judgment disposition, we assume it to be true, with the future to determine if the facts stated in the affidavit of appellant can be proven at trial.

**4.** This rule is defined in *Hunter Co., Inc. v. Shell Oil*, 211 La. 893, 31 So.2d 10 (1947); Williams and Meyers, *The Effect of Pooling and Unitization Upon Oil and Gas Leases*, 45 Calif.L.Rev. 411, 448–449 (1957):

"It is further our position that in a jurisdiction which has treated the lease as nondivisible, the court should be willing to find that there is a duty of further exploration as to the excluded acreage. Failure of the courts to enforce a rigid duty of exploration will permit lessees to retain acreage indefinitely without any compensation to lessors for holding such land and without any obligation to search the land for new mineral deposits. Moreover, it precludes exploration by others who are thus unable to obtain a lease.

"The decision in the Hunter case has had and will continue to have a generally unfortunate effect. It has caused lessors to oppose the enactment of compulsory pooling and unitization statutes and to resist participation in voluntary agreements. It is fair to say that pooling and unitization serve the public policy of preventing physical and economic waste and that rules which discourage lessors from consenting to pooling and unitization defeat that public policy; the rule of Hunter clearly has that effect. That this is recognized is perhaps evidenced by the recent pattern of decisions in Louisiana on prescription *liberandi causa*. Recent cases have treated a servitude as divisible between the included and excluded acreage where pooling or unitization is involved and have held that prescription *liberandi causa* is not interrupted or suspended in the case of excluded acreage by production from or operations on the unit in which a part of the leasehold is included."

noncommitted acreage beyond term unless compliance with the production or development requirements of the lease actually occur on-premises. *Texas Gulf Producing Co. v. Griffith,* 218 Miss. 109, 65 So.2d 447 (1953). See Rebman, *Continuation of the Oil and Gas Lease on Production Within the Unit,* 35 Texas L.Rev. 833 (1957). Many text writers support this rule with persuasive logic. See Comment, *Production From Compulsory Pooled Unit Extends Lease on Outside Acreage?,* 33 Rocky Mt.L.Rev. 184 (1960); See also 30 U.S.C. 226J, reflecting congressional attitude on federal leases.

> "If only a portion of the leasehold is included in the unit, the lease is extended as to the segregated portion included in the unit by unit production and the lease as to the segregated nonunitized portion will continue in effect for the term of the base or parent lease but for not less than two years from the date of segregation." 6 H. Williams and C. Meyers, Oil and Gas Law, § 953 at 726.11

See also Williams and Meyers, *The Effect of Pooling and Unitization Upon Oil and Gas Leases,* 45 Calif.L.Rev. 411 (1957).

In this case of federal leases which segregate the lands into separate leases when only a portion of the land is included within a unit, production or the nonunitized portion does not "attribute" to the unit as production or to the unitized lands. 6 H. Williams and C. Meyers, supra.

> "Our position is based on the fact that * * * the lessor realizes no benefit from the lease on the excluded acreage by virtue of production from the unit; his share of production is limited to a pro rata distribution based on the amount of the acreage included within the unit or upon some other participation formula which gives no weight to the excluded acreage. The lessee, on the other hand, is able to retain the excluded acreage for speculative purposes without operations thereon and without making any payment for retaining the excluded land." 6 H. Williams and C. Meyers, supra, at 725.

Oklahoma has adopted a modified Pugh clause by statute. *Siniard v. Davis,* Okla. App., 678 P.2d 1197 (1984). Lacking legislative attention in Wyoming, I would follow the logic, economic justification, and reasoned persuasion of the Mississippi rule so that uninformed landowners, in absence of Pugh-clause knowledge, are properly protected.

## ALTERNATIVE REMEDY FROM IMPLIED COVENANTS

The second and even more disturbing aspect of the court's decision is the cavalier statement:

> "This case was presented to both the trial court and this court upon the parties' agreement that upon undisputed facts the only issue was one of interpretation of the parties' contract. There was no claim that the leased area might be drained by production from the communitized area. If such claim is ever made, appellant is *amply protected* by the implied covenant of reasonable development and the implied covenant against drainage." (Emphasis added.)

I do not agree either factually or practically. It is this court that creates the ill-chosen standard. The stated justification totally ignores the clear desecration of any actual remedy of implied covenant of reasonable development, or against drainage by virtue of the decision of this court in *Kuehne v. Samedan Oil Corp.,* Wyo., 626 P.2d 1035 (1981). See also *Sonat Exploration Co. v. Superior Oil Co.,* Wyo., 710 P.2d 221 (1985); *Brewster v. Lanyon Zinc Co.,* 140 F. 801 (8th Cir.1905), approved by this court in *Sonat,* supra.

The industry cannot assume an implied withdrawal from Kuehne by the comment of the majority in this case, even though the "amply protected" designation is sheer nonsense in actual result. That fact is clearly evident in the instant case; although the lease was executed in 1967 for a stated term of ten years, there has never been any development or production on the leased lands for nearly 20 years, and a retained claim to undeveloped acreage continues.

We can find witness in Louisiana where, contrary to Kuehne, a realistic leasehold

extinguishment can be secured for undeveloped acreage when the stated term ends if factually no action is demonstrable of oil company development for attribution to the claimed lease acreage. *Nunley v. Shell Oil Co.*, La.App., 76 So.2d 111 (1954), aff'd 229 La. 349, 86 So.2d 62 (1956); *Vetter v. Morrow*, La.App., 361 So.2d 898 (1978). Actually, this corollary for the Louisiana rule reaches very nearly the same practical result as the Mississippi standard for rejection of offpremises pooling attribution.

"It should be noted that in Louisiana, the Hunter case does not have the same effect as it will be accorded in Colorado. Under the Louisiana law a mineral grant or reservation is considered a servitude and is subject to loss by prescription when not used for ten years. Recent cases in Louisiana have held that the prescriptive period is not interrupted on the outside acreage when a part of the leasehold is included in a unit created voluntarily or under forced pooling. Thus if the identical fact situation as found in Clovis arose in Louisiana today, the Louisiana court would find that the outside acreage was no longer under lease having been freed by prescription." Comment, 33 Rocky Mountain L.Rev., supra at 196.

Colorado, if it has applied the Louisiana principle on drainage and nondevelopment to *Clovis v. Pacific Northwest Pipeline Corp.*, supra, would not be substantially dissimilar but, unfortunately, Wyoming does not have the Louisiana corollary which could otherwise abrogate the harshness of the attribution rule now adopted by this court. An extension of the Louisiana corollary is recently discussed in the federal courts construing Alabama law:

"Determining that the lease continues beyond the primary term does not conclude our inquiry. We must examine the inherent rights of lessors to reasonable development of their property when they grant an OGM lease. In a case in which it applied the majority rule above (that drilling anywhere within the unit extends the lease on land both within and without the unit), one court stated, 'The rationale of the majority rule is recognition by the courts that the implied covenants for reasonable development and protection against drainage apply to leased lands outside of pooled units....' *Clovis v. Pacific Northwest Pipeline Corp.*, 140 Colo. 552, 556, 345 P.2d 729, 730 (1959). The rule imposing a duty of reasonable development is widely recognized. The obligation of reasonable development is imposed upon lessees 'because the failure further to drill might leave untapped oil which could be produced, or result in permanent loss of otherwise recoverable oil or a slower rate of production, thus depriving the lessor of the use of the capital represented by the unproduced royalty oil.' * * *

"The essential question before us is whether the implied covenant of reasonable development, which would otherwise pervade the performance of an OGM lease, is somehow muted or abated by the presence of a unitization order.

We hold that the lessee's obligation to develop reasonably exists whether or not there is a pooling or unitization order. " * * * [R]elease from the obligations to develop 'each tract separately' and to 'prevent drainage' does not extend to acreage outside the revenue sharing unit or, as it is referred to in this case, the productive limit. Presumptively, the very purpose of unitization, whether voluntary or enforced, is to determine and place within a productive unit the area to be drained. The exclusion of land from within a unit is, necessarily, a determination that it will not be drained by a well or wells on the adjacent properties. Therefore, in the usual situation, development inside the unit is insulated from, if indeed not the antithesis of, development outside the unit.

" * * * Exxon has the obligation under both the Unit Agreement and venerable precedents to develop reasonably the subject property. Whether Exxon has done so is a fact question which must be resolved, very probably with the aid of experts. It is the kind of factual determination which is seldom carried by the summary judgment vehicle. It will be

the Mizes' burden to establish that Exxon was deficient in its efforts to develop reasonably the 39 acres it declines to release from the lease." *Mize v. Exxon Corporation,* 640 F.2d 637, 641–642 (5th Cir.1981).

*Magnolia Petroleum Co. v. Rockhold,* 192 Okla. 628, 138 P.2d 809, 810 (1943): " * * * Where production is obtained during the primary term of a lease, and it is disclosed that the lessee has failed and refused to fully develop the leasehold within a reasonable length of time and there has been unreasonable delay in development a prima facie case is made in an action by the lessor to cancel the undeveloped portions thereof and the burden is upon the defendant lessee to show that the lease has been developed in the manner reasonably to be expected of an operator of ordinary prudence."

See *Buchanan v. Sinclair Oil & Gas Company,* 218 F.2d 436, 441 (5th Cir.1955); *Gregg v. Harper-Turner Oil Co.,* 199 F.2d 1 (10th Cir.1952); *Arkansas Oil and Gas, Inc. v. Diamond Shamrock,* 281 Ark. 207, 662 S.W.2d 824 (1984); *Byrd v. Bradham,* 280 Ark. 11, 655 S.W.2d 366 (1983); *Doss Oil Royalty Co. v. Texas Co.,* 192 Okl. 359, 137 P.2d 934 (1943); Williams and Meyers, 45 Calif.L.Rev., supra, at 449; Rebman, 35 Texas L.Rev., supra, at 838.

A policy decision should be acknowledged, if not accommodated. The theory of statutes of limitation and statutes of repose, as well as the rule against perpetuities, arise from the same governmental philosophy of deterring indefinite nonaction by controlling finite resources. Philosophers and historians have recognized the characteristic of the State of Wyoming throughout territorial days and century-long statehood to be an abused territory of external economic interests. A state's self-interest direction of use and development contrasted with shelf storage is demonstrably indicated. Twenty years is a long time to sit on leased lands without turning a drill bit. The unfortunately adverse aspects of Kuehne and Sonat Exploration, detrimental to the welfare of the intrinsic interests of the State of Wyoming, are now exacerbated by this present nonaction protection decision. I would agree with the philosophy denominated by cases from Louisiana and Arkansas that after so long it is time to say so long. See criticism of *Sonat Exploration Co. v. Superior Oil Co.,* supra, in Note, *The Burden of Proof in Implied Covenant to Develop Cases: Wyoming Rejects the 'Oklahome Rule,'* XXII Land and Water L.Rev. 141 (1987).

I would reverse the summary judgment, and adopt the Mississippi rule. In any event the trial court should determine "intent" to provide the litigant with "ample protection" through both the implied covenant of reasonable development and the implied covenant against drainage.