Brent ANDERSEN, Appellant (Defendant),

v.

Ray CORBITT, Appellee (Defendant).

No. 88–176.

Supreme Court of Wyoming.

June 27, 1989.

Rehearing Denied July 26, 1989.

Harley J. McKinney of Pickett & McKinney, Rock Springs, for appellant.

Robert H. Johnson, Rock Springs, for appellee.

Before THOMAS, URBIGKIT and MACY, JJ., BROWN, J., Retired, and LEIMBACK, District Judge.

URBIGKIT, Justice.

We are provided a settlement agreement negotiated between law firms which did not stay settled resulting in a $20,000 interpleader suit and the involvement of two more law firms to decide who gets the deposited funds. The extreme hostility between the individual litigants is pervasive. Appeal is taken from a summary judgment disposition and we reverse to award the escrowed funds to appellant, Dr. Brent Andersen (Andersen).

The facts are more complex than the agreement which was made for disposition of the money. All of this arises out of problems at the Southwest Counseling Service (SCS) of Rock Springs and its personnel problems.

The actors included Andersen, a clinical psychologist and director of SCS, who came into conflict with appellee, Dr. Ray Corbitt (Corbitt), an experimental psychologist. Litigation started when Corbitt sued An-

dersen and SCS in federal court for "an abuse of public power in attempting to control competing private practitioners" under 42 U.S.C. § 1983 and common law tort. That suit resulted in a verdict in favor of SCS and against Andersen, assessing a total damage award of $111,843 plus attorneys' fees and expenses of $46,471.11. Appeal was taken from this verdict to the Tenth Circuit Court of Appeals. The insurance carrier for SCS which had represented SCS and Andersen under reservation of right, continued representation after the unfavorable judgment on the same basis without posting any supersedeas bond to deter execution on the judgment entered against its insured, Andersen.

While all of this was going on, SCS terminated Andersen's employment which caused him to institute an action in state court for wrongful discharge. In February 1984, with the appeal pending in federal court on the Corbitt/Andersen suit and immediate trial in Andersen/SCS pending, attorneys Roy Jacobson of the law firm of Vehar, Beppler, Jacobson, Lavery & Rose representing Andersen and Charles E. Graves and Associates representing Corbitt discussed an arrangement to protect Andersen from judgment execution. It is out of those discussions that an arrangement was derived as reflected in a letter dated February 17, 1984 which now provides the basis of continuing litigation after both the other cases have been resolved, claims paid, and funds disbursed.

That letter, under Jacobson's letterhead, was addressed to Graves and stated:

Let this confirm our telephone agreement of this date as to granting a covenant not to execute in favor of Brent Andersen in the *Corbitt* action:

(a) Brent Andersen will pay the sum of $15,000 $20,000 to Corbitt and his attorneys from the settlement proceeds of *Andersen v. Southwest Counseling Service, et al.;* in the event *Corbitt v. Andersen, et al.* is reversed, Corbitt may retain the $15,000 $20,000;

(b) Corbitt will grant to Brent Andersen a covenant not to execute against him, personally, including settlement proceeds from *Andersen v. Southwest Counseling Service, et al.;*

(c) Brent Andersen will partially assign to Corbitt his bad faith claim against the insurance carrier(s) (Lexington/Glacier) in the sum of the outstanding amount of the judgment in *Corbitt v. Andersen, et al.* (less $25,000 $20,000) plus accrued interest, plus 10% of any additional monies received from settlement or verdict (i.e., punitive damages) of any kind—all to be paid to Corbitt only **after** reasonable costs of litigation are deducted, exclusive of attorney fees;

(d) Brent Andersen will pay the costs of litigation of any bad faith claim on Corbitt; provided however, the law firm of his choice prosecutes the action in a timely manner. It is understood and agreed that a bad faith claim is not ripe until such time as the 10th Circuit Court of Appeals affirms the *Corbitt v. Andersen, et al.* judgment;

(e) It is understood by you and Corbitt that under the terms of settlement in *Andersen v. Southwest Counseling Service, et al.,* the amount of settlement is confidential and cannot, and has not, been released to you by Brent Andersen or his attorney;

(f) Brent Andersen, or his attorney, shall prosecute the bad faith claim, in their sole reasonable discretion; provided however, there will be **no** settlement of the claim without the prior written consent of Corbitt and his attorneys. Corbitt and his attorneys may reasonably demand a settlement for all, or part, of their interest in the bad faith claim; provided however, Brent Andersen may choose to continue the bad faith claim by paying Corbitt all, or part, of his interest therein demanded without settling the suit. Brent Andersen and his attorneys shall keep Corbitt and his attorneys advised of the progress of the bad faith claims at all times material. Further, Corbitt agrees to cooperate fully in the prosecution of the bad faith claims (including being a named party to the bad faith claim if deemed necessary);

(g) All parties hereto (Brent Andersen and Corbitt) shall execute any and all documents necessary to fully effectuate the terms of this agreement; and

(h) The terms of this agreement are to be kept fully confidential by the parties, and their respective attorneys; provided however, the terms and conditions may be released to the extent necessary to properly prosecute the bad faith claim.

Chuck, if these conditions accurately reflect our agreement, please sign the acknowledgement portion below. [Emphasis in original.]

The letter (Exhibit A) was electronically transmitted from Kemmerer to Cheyenne, signed by Graves and then returned to Kemmerer.

Benefits to be derived by Andersen were obvious including protection from execution levied on any settlement he might make in his wrongful discharge suit against SCS. Also, Corbitt was benefitted by having immediate funds to offset costs of litigation and appeal to the Tenth Circuit Court of Appeals should his judgment be reversed.

The $20,000 was paid and apparently placed in some kind of an interest account under the control of the Graves' firm and the appeal to the Tenth Circuit Court of Appeals proceeded to affirm rendering a decision two years later in March 1986. With affirmed judgment, Jacobson immediately started action pursuant to the obligations of Exhibit A, as he testified, to "kick ass" to secure payment from Lexington/Glacier insurance carriers. For assistance, he employed an attorney with extensive practical experience in insurance bad faith litigation in this jurisdiction. At the same time, Graves, on behalf of Corbitt, the judgment creditor, made an offer of settlement by direct contact with representatives of Lexington/Glacier. The terms included payment in full of the judgment, attorneys' fees, and interest to date without the addition of any appellate attorneys' fees, which services basically had been rendered by counsel hired by the insurance carriers. It came to be, by agreement of all parties, that settlement was made with the insurance carriers which paid the amount demanded by Graves.[1]

Both psychologists became adamant about their rights to the $20,000 and Graves filed an interpleader action to secure a court determination of whom should get the $20,000 plus accrued interest that he held in law firm escrow. After discovery, including depositions of prior counsel, the present proceedings proceeded with new attorneys for both Corbitt and Andersen, resulting in summary judgment granted to Graves for his attorneys' fees incurred in the interpleader action and the balance of funds granted to Corbitt. Andersen now appeals from the award to Corbitt of $18,261.13 ($20,000 less attorneys' fees of $1,738.87) plus accrued escrow fund interest.

The argument of litigants presented a dispute whether the confirming letter, Exhibit A, unambiguously determines that Corbitt should return the money. Andersen contends that Exhibit A is ambiguous, requiring extrinsic evidence for interpretation which prohibits entry of summary judgment. Conversely, Corbitt looks at the same information and finds that Exhibit A is clear and, if not clear, any extrinsic evidence "supports the judgment entered by the trial court."

Factually, Andersen finds the right for his refund when Corbitt was paid in full by the insurance carriers which included the $20,000 which he had prepaid. He contends when Corbitt was paid in full with interest and attorneys' fees, that a "settlement" of the bad faith claim had in fact, or at least in part, occurred. Conversely, Corbitt considers the $20,000 to be considera-

---

1. The record rather positively suggests that the first disagreement thereafter occurred between Andersen and Corbitt as to the right to interest on the $20,000 during the prior two-year period. This was actually a reasonably insignificant amount. In thinking about the subject, Corbitt became convinced that not only was he entitled to the interest (with which we would now agree), but also the total sum since Andersen had not pursued a bad faith claim to successful conclusion.

tion for hedging against reversal and insurance carrier nonpayment. Also, Corbitt argues it did not constitute a prepayment on the rendered judgment since in the event that the federal court judgment was reversed, the $20,000 would be the total that Corbitt would have been entitled to receive.

■ A settlement agreement is a contract which is subject to the same legal principles applicable to construing contracts. *Folsom v. Butte County Ass'n of Governments*, 32 Cal.3d 668, 186 Cal.Rptr. 589, 652 P.2d 437 (1982); *Riley Pleas, Inc. v. State*, 88 Wash.2d 933, 568 P.2d 780 (1977); *Stottlemyre v. Reed*, 35 Wash.App. 169, 665 P.2d 1383 (1983). The mutual intent of the parties at the time of making the agreement must be ascertained and given effect. *Washburn v. Washburn*, 204 Kan. 160, 460 P.2d 503 (1969); *Matter of Estate of Engels*, 10 Kan.App.2d 103, 692 P.2d 400 (1984); *Matter of Estate of Hollingsworth*, 88 Wash.2d 322, 560 P.2d 348 (1977). A settlement agreement must be construed in light of the language used and the circumstances surrounding its creation. *Matter of Estate of Engels*, 692 P.2d at 404; *Riley Pleas, Inc.*, 568 P.2d at 783; *Stottlemyre*, 665 P.2d at 1385. If a settlement agreement is unambiguous, a court is bound by the agreement's language which is controlling. *Burden v. Colonial Homes, Inc.*, 79 N.M. 170, 441 P.2d 210 (1968). "Contract construction and interpretation are done by the court as a matter of law." *True Oil Co. v. Sinclair Oil Corp.*, 771 P.2d 781, 790 (Wyo.1989). *See also Amoco Production Co. v. Stauffer Chemical Co. of Wyoming*, 612 P.2d 463 (Wyo.1980) and *Bulis v. Wells*, 565 P.2d 487 (Wyo.1977). "The existence of ambiguity is a question of law." *True Oil Co.*, 771 P.2d at 790. *See also Hensley v. Williams*, 726 P.2d 90 (Wyo.1986) and *Amoco Production Co.*, 612 P.2d at 465.

As unfortunately now exists, the two lawyers who negotiated and signed Exhibit A do not agree on what was intended or on what it says. Consequently, with a clear conflict within extrinsic evidence, this court must first determine whether Exhibit A is unambiguous and, if not, whether the extrinsic evidence is such that summary judgment was improper. See *Cordova v. Gosar*, 719 P.2d 625 (Wyo.1986).

First, apparently the psychologist litigants, as confirmed in oral argument, are more interested in litigation than economic realism, whether available with a jury trial or not. The record communicates an impression that the participants were not satisfied with their prior compliment of litigation. In appellate review, this court finds no persuasive thesis justifying the litigation to continue if an end can be found. On that basis, we examine the details of the confirmatory agreement to determine whether mutual intent as defined in express terms is to be found.

■ Second, if interest on the $20,000 was the fuel for litigation, that was an unfortunate development since it was not defined in agreement details. However, clearly, the $20,000 was a payment and not an ·escrow against contingency. As such, interest belonged to the recipient, Corbitt, who owned the money during the period burdened only by a deduction factor from a contingent future recovery. Consequently, any interest earned on the payment belongs to Corbitt and/or his attorney as a question between them as client and attorney.

■ The construction of Exhibit A to determine whether repayment obligation accrued after the judgment was paid in full by the insurance carriers is more difficult. To construe the document, we inquire whether realistically these parties did or did not settle "the bad faith claim" at least in part when Corbitt was paid in full with accrued interest and all attorneys' fees. Differing in some regard from litigants' arguments, we rely on common sense, reason, and specific terminology of the unambiguous agreement to reach our decision. Exhibit A expressly provided that "Brent Andersen will partially assign to Corbitt his bad faith claim against the insurance carrier(s) (Lexington/Glacier) in the sum of the outstanding amount of the judgment * * * **(less $25,000 $20,000)."** (Emphasis added.) We conclude that against the backdrop of the bad faith claim that was

settled by mutual agreement of both parties, Corbitt was entitled to everything on his judgment but the $20,000. The $20,000 had never been assigned to him within the bad faith claim and which amount, incidentally, otherwise reduced the judgment obligation of the insurance carriers to pay him as **the third party claimant.** Since the entire judgment was to be paid with accrued interest and attorneys' fees, the insurance carriers were not liable for the entire judgment plus the $20,000 that Corbitt had already received from Andersen.

■ A judgment is a confirmation and formalization of a party's damage award indicating how much a person has been injured.

It is a fundamental principle that underlies the damage assessment that a person injured shall only receive compensation commensurate with his loss, and no more. *Rocky Mountain Packing Co. v. Branney,* Wyo., 393 P.2d 131, 135 (1964); *Hunt v. Thompson,* 19 Wyo. 523, 120 P. 181, 184 (1912).

*Willmschen v. Meeker,* 750 P.2d 669, 673 (Wyo.1988). Damages are to compensate for loss. *Douglas Reservoirs Water Users Ass'n v. Cross,* 569 P.2d 1280 (Wyo.1977); *Walton v. Atlantic Richfield Co.,* 501 P.2d 802 (Wyo.1972). A plaintiff is only entitled to be made whole, but not to be compensated more than his damage. *Brown v. Valley Nat. Bank of Arizona,* 26 Ariz.App. 538, 549 P.2d 1056 (1976). The allowance of double recovery through the use of "double damages" is not favored. *See Reynolds v. Tice,* 595 P.2d 1318 (Wyo. 1979); *Western Nat. Bank of Casper v. Harrison,* 577 P.2d 635 (Wyo.1978); and *Kammerer v. Western Gear Corp.,* 27 Wash.App. 512, 618 P.2d 1330 (1980), *aff'd* 96 Wash.2d 416, 635 P.2d 708 (1981).

Cogently stated, either the money was refundable to Andersen or a fraud was perpetuated on the carriers since, in the absence of a bad faith claim assignment, the maximum obligation of the insurance company was the judgment and not the judgment plus $20,000 which the insured advanced.[2] It follows that the propriety of the collection of the $20,000 by Corbitt could only be justified as part of the bad faith claim in which event the refund provision of the agreement was effectuated.

Realistically, Corbitt settled with the carriers for an amount of money of which $20,000 was an unassigned right for repayment to Andersen. The same result would have applied if Andersen had advanced $100,000 for the covenant not to execute or had actually paid the entire judgment.

Within this concept, we are troubled by the argument of Corbitt that a bad faith claim still lurks out there somewhere and that the repayment right matures only after that opportunity is exhausted. This argument is presented both in brief and oral argument by Corbitt that the effectuated terms of Exhibit A have not yet and cannot be achieved until litigation is instituted, since what Andersen did through his attorneys did not constitute compliance with the requirements of paragraph (f) in Exhibit A to "prosecute the bad faith claim."

We recognize that the principal concern of both participants was to get the judgment paid by the insurance carriers. This happened. We do not perceive from Exhibit A that the parties intended a covenant to litigate, not just to settle, was created. Besides, if settlement of the judgment had occurred and Andersen were to sue the carriers for the $20,000, the carriers would be entitled to make a third-party claim against Corbitt who collected an amount in excess of his entitlement under a judgment; especially since the amount previously paid had been carefully hidden from the insurance carriers by agreement of the parties.[3]

**2.** The collateral source rule is inapplicable to the facts presented by this case because the $20,000 was advanced by Andersen. Thus, there was no collateral source. *See Aragon v. Brown,* 93 N.M. 646, 603 P.2d 1103, 1105 (1979). For a general discussion of the collateral source rule, see *Wheatland Irrigation Dist. v. McGuire,* 562 P.2d 287, 301–02 (Wyo.1977).

**3.** With settlement of their principal anxiety by judgment collection, it seems unlikely that the parties or their lawyers will desire to continue these battles on a most problematical and cer-

Summary judgment is only proper where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Although Andersen urges on appeal that this court construe Exhibit A to be ambiguous, we hold that it is not. However, we do find that the district court erred as a matter of law in determining the parties' intent in Exhibit A.

To clarify, since the issue of interpleader attorneys' fees is not at issue, any interest earned on the escrowed funds of $20,000 prior to the date of insurance carriers' settlement should be paid to Corbitt, and any balance, including interest earned since that date, should be paid by the present escrow holder, the Clerk of the District Court, Third Judicial District, to Andersen. Payments will be made in the following amounts: Charles E. Graves, if not heretofore paid pursuant to district court order of April 26, 1988—$1,738.87; interest accrued on the $20,000 from date of original payment to April 16, 1986 to be paid to Corbitt; any amount remaining with currently accrued interest in the hands of the Clerk of the District Court will be paid to Andersen.[4] However, if Charles E. Graves does not file a certificate stating the interest accrued to the date of the settlement of the Corbitt/Andersen judgment or if the parties desire to continue the controversy to contest any amount that may be certified, the case is remanded to the district court for such further action as may be required in conformity herewith.

Reversed and remanded.

THOMAS, J., filed a dissenting opinion with whom BROWN, J., Ret., joined.

THOMAS, Justice, dissenting, with whom BROWN, Justice, Retired, joins.

I cannot agree with the disposition of this case according to the majority opinion, and I dissent. The majority is able to reach the result it has only by structuring a legal fiction.[1] The fiction, in this instance, is that the payment by the insurance carrier to Ray Corbitt was a partial settlement of a bad faith claim owned by Brent Andersen.

My objection to the disposition according to the majority opinion is that it simply flies in the face of our well-established rule that this court will not, nor is it free to, rewrite contracts because we are bound to apply a contract as it is written so long as there is no ambiguity. *Arnold v. Mountain West Farm Bureau Mutual Insurance Company, Inc.*, 707 P.2d 161 (Wyo. 1985); *Adobe Oil & Gas Corporation v. Getter Trucking Company, Inc.*, 676 P.2d 560 (Wyo.1984); *Rainbow Oil Company v. Christmann*, 656 P.2d 538 (Wyo.1982); *McCartney v. Malm*, 627 P.2d 1014 (Wyo. 1981); *Wyoming Machinery Company v. United States Fidelity & Guaranty Company*, 614 P.2d 716 (Wyo.1980); *Quin Blair Enterprises, Inc. v. Julien Construction Company*, 597 P.2d 945 (Wyo. 1979); *Laird v. Laird*, 597 P.2d 463 (Wyo. 1979); *Overcast v. Baldwin*, 544 P.2d 464 (Wyo.1976), cert. denied sub nom. *Taylor v. Taylor*, 429 U.S. 855, 97 S.Ct. 151, 50 L.Ed.2d 131 (1976); *Younglove v. Graham & Hill*, 526 P.2d 689 (Wyo.1974); *Goodman v. Kelly*, 390 P.2d 244 (Wyo.1964); *McGinnis v. General Petroleum Corporation*, 385 P.2d 198 (Wyo.1963); *Flora Construction Company v. Bridger Valley Electric Association, Inc.*, 355 P.2d 884 (Wyo.1960); *Casper National Bank v. Curry*, 51 Wyo. 284, 65 P.2d 1116, 110

---

tainly ephemeral bad claim which had been "partially settled" by the insurance company's payment of about $211,000. We do not discern a basis for Corbitt to retain the $20,000 pending filing of an undeserved and probably economically unjustified "bad faith lawsuit."

**4.** We observe that earned interest to April 27, 1988 was $2,494.37, since the deposit to the Clerk of the District Court was by check in the amount of $22,494.37 which apparently consti-

tuted the $20,000 plus accrued interest on the fund.

**1.** A legal fiction is defined in Black's Law Dictionary (5th ed. 1979) at 804 as follows:
"Assumption of fact made by court as basis for deciding a legal question. A situation contrived by the law to permit a court to dispose of a matter, though it need not be created improperly; e.g. fiction of lost grant as basis for title by adverse possession."

A.L.R. 360 (1937); *Douglas Oil Fields v. Hamilton,* 17 Wyo. 54, 95 P. 849 (1908); *Phillips, et al. v. Hamilton,* 17 Wyo. 41, 95 P. 846 (1908). In contravention of this painfully clear rule, the effect of the majority opinion, in this instance, is the same as if it were to rewrite the letter agreement between Andersen and Corbitt so that it addresses the ultimate payment of Corbitt's judgment against Andersen by Andersen's insurance company. That agreement is quoted in its entirety in the majority opinion, and I must agree with the conclusion of the majority that the agreement is unambiguous. It does not, in any way, approach terms which would resolve the disposition of the $20,000 in the event that Corbitt's judgment, in fact, was paid.

Properly construed, that agreement provides for a payment of $20,000 by Andersen to Corbitt to secure from Corbitt a covenant not to execute against Andersen personally. After subparagraph (b) of its terms, the agreement goes on to discuss, apparently as additional consideration from Andersen to Corbitt, the assignment of Andersen's claim against his insurance carrier for its bad faith in not paying Corbitt's judgment and in not providing adequate representation to Andersen. So far as this record reveals, the insurance carrier, when it paid Corbitt's judgment, was not in any way advised of this assignment by Andersen to Corbitt. If it had known of that, the conclusion is ineluctable that it would have endeavored to secure a release of that claim rather than simply a satisfaction of Corbitt's judgment against Andersen. The fact is that Andersen's bad faith claim against his insurance carrier has not been resolved even in part.

In structuring the legal fiction that the payment of Corbitt's judgment, in fact, was a partial resolution of Andersen's bad faith claim, the majority substitutes its superior legal acumen for that of counsel for Andersen and Corbitt. The majority knows that the matter should have been addressed in the agreement, but it was not. The visionary approach which is then pursued is not to rewrite the agreement, a course the majority recognizes is not available. Instead, the majority manufactures other facts to fit the unambiguous agreement of the parties. The net result, while the majority claims it is avoiding double payment to Corbitt, is to deprive Corbitt of $20,000 which he received in exchange for a covenant not to execute against Andersen, a promise which Corbitt faithfully performed.

In my judgment, this majority opinion is such a severe departure from both fact and law that it ought not to be countenanced. I would affirm the summary judgment entered by the district court.