2016 ND 168

**Sandra HOROB, Steven Poeckes, Steve Shae, Mike Shae, and Paul Shae, Plaintiffs and Appellants**

**v.**

**ZAVANNA, LLC, Wiser Oil Company, CSX Oil Corporation, Petro Hunt, LLC, Atlantic Richfield Co. assigned to BP American Production Company, Mid–Continent Energy Investors, LP, Huntington Natural Resources, Texas Gas Exploration, Westport Oil & Gas Company, Empire Drilling Company, Gene McCutchin, John Klemer, Lamar Hunt, Caroline Hunt Schoelkopf f/k/a Caroline Hunt Sands, Estate of Loyd B. Sands, William Herbert Hunt**

Trust Estate, Farrar Oil Co., Mary K. Harris, Steven H. Harris Family Limited Partnership, Forest Oil Corp., A.G. Golden, Mary S. Golden, Great American Drilling Partnership–1, Great American Drilling Exploration Corp., Atropos Exploration Co., Al–Aquitaine, Inc. f/k/a Aquitaine Oil Corp., Panda Exploration, Inc., Adobe Resources Corp., Prince Minerals, Ltd., Prince Minerals II, Ltd., Texas Gas Exploration, Ltd., Western Exploration, Ltd., Mid–Continent Energy, Inc., Spring Creek Exploration and Production, LLC, Vintage Oil & Gas, LLC, Sierra Resources, Inc., Internos, Inc., Pradera Del Notre, Inc., David D. Peterson, Atropos Exploration, Inc., Richie V. Matchette, Split Creek Enterprises, LLC, Wild Basin Oil & Gas, Onyx Energy, LLC, Cody Oil and Gas, Mountain View Energy, Crystal BGF, LP, Anglin Oil, LLC, Pearson Oil & Gas, LLC, Serenity, LLC, Sundance Energy, Bakken Caballeros, Rutter Enterprises, Weisser Oil, Eagle River Ventures, Ulmer Energy, Liberty Resources, River Bend, Keybridge Resources, LLC, Denbury Onshore, and Energen Resources Corp., Defendants

Zavanna, LLC, Petro Hunt, LLC, Atlantic Richfield Co. assigned to BP American Production Company, John Klemer, William Herbert Hunt Trust Estate, Mary K. Harris, Steven H. Harris Family Limited Partnership, Spring Creek Exploration and Production, LLC, Vintage Oil & Gas, LLC, Sierra Resources, Inc., Internos, Inc., Pradera Del Notre, Inc., Split Creek Enterprises, LLC, Wild Basin Oil & Gas, Onyx Energy, LLC, Cody Oil and Gas, Mountain View Energy, Crystal BGF, LP, Anglin Oil, LLC, Pearson Oil & Gas, LLC, Serenity, LLC, Sundance Energy, Bakken Ca-

balleros, Rutter Enterprises, Weisser Oil, Eagle River Ventures, Ulmer Energy, River Bend, Keybridge Resources, LLC, and Energen Resources Corp., Appellees.

No. 20150203.

Supreme Court of North Dakota.

Aug. 23, 2016.

Joshua A. Swanson, Fargo, N.D., for plaintiffs and appellants.

Michael D. Schoepf (argued) and Lawrence Bender (on brief), Bismarck, N.D., for defendants and appellees Zavanna, LLC, Petro Hunt, LLC, Atlantic Richfield Co. assigned to BP American Production Company, John Klemer, Mary K. Harris, Steven H. Harris Family Limited Partnership, Spring Creek Exploration and Production, LLC, Vintage Oil & Gas, LLC, Sierra Resources, Inc., Internos, Inc., Pradera Del Notre, Inc., Split Creek Enterprises, LLC, Wild Basin Oil & Gas, Onyx Energy, LLC, Cody Oil and Gas, Mountain View Energy, Crystal BGF, LP, Anglin Oil, LLC, Pearson Oil & Gas, LLC, Serenity, LLC, Sundance Energy, Bakken Caballeros, Rutter Enterprises, Weisser Oil, Eagle River Ventures, Ulmer Energy, River Bend, Keybridge Resources, LLC, and Energen Resources Corp.

Nicholas P. Laurent (on brief), Austin, TX, for defendant and appellee Vintage Oil & Gas, LLC.

John W. Morrison, Jr. (on brief) and Paul J. Forster (on brief), Bismarck, N.D., for defendants and appellees Petro Hunt, LLC, and William Herbert Hunt Trust Estate.

CROTHERS, Justice.

[¶ 1] Sandra Horob, Steven Poeckes, Steve Shae, Mike Shae and Paul Shae, the successors to the interests of John and Bernice Shae ("Horob plaintiffs"), appeal from a summary judgment deciding ownership of an oil and gas lease in favor of the successors to the interest of the William Herbert Hunt Trust Estate (collec-

tively "defendants") and declaring the lease did not terminate and remains in effect. We affirm, concluding the lease remains in effect under a communitization agreement with the United States.

## I

[¶ 2] John and Bernice Shae owned oil, gas and other mineral interests in Williams County. In 1969 the Shaes leased their interests to the William Herbert Hunt Trust Estate ("Shae lease"). The Shae lease covers a 1,057.72–acre area and states it will remain in force for ten years and as long thereafter as oil or gas is produced. The Shae lease also contains a cessation of production clause:

"If, prior to discovery of oil, liquid hydrocarbons, gas or their respective constituent products, or any of them, on said land or on land pooled therewith, lessee should drill and abandon a dry hole or holes thereon, or if, after discovery of oil, liquid hydrocarbons, gas or their respective constituent products, or any of them, the production thereof should cease from any cause, this lease shall not terminate if lessee commences additional drilling or reworking operations within sixty (60) days thereafter."

[¶ 3] The Rolfstad well was drilled on a spacing unit containing part of the Shae property and began producing oil in 1979. In 1987 the operator of the well, Wiser Oil Company, signed a communitization agreement with the United States to pool federal oil and gas leases that cannot be independently developed with other leases. The 160–acre communitized area includes the Rolfstad well and 40 acres (21.61 net) of the Shae lease. The agreement states it will remain in force for two years "and for so long as communitized substances are, or

can be, produced from the communitized area in paying quantities[.]" The agreement contains a cessation of production clause similar to the lease stating it "shall not terminate upon cessation of production if, within sixty (60) days thereafter, reworking or drilling operations on the communitized area are commenced and are thereafter conducted with reasonable diligence during the period of nonproduction." The agreement also states "production pursuant to this agreement shall be deemed to be ... production as to each lease committed hereto."

[¶ 4] Continental Resources, Inc., has operated the Rolfstad well since 2001.[1] According to a monthly well production report the Rolfstad well did not produce oil from April 2004 through September 2004, November 2006 through January 2007 and December 2010 through February 2011. Continental resumed production and paid royalties under the Shae lease to the Horob plaintiffs or their predecessors after each lapse in production.

[¶ 5] In October 2011 Defendant Zavanna, LLC, began drilling Bakken oil and gas wells on or pooled with the Shae lease property. Two wells in particular, the Panther well and the Beagle well, produced over 375,000 barrels of oil through November 2014. Zavanna paid royalties to the Horob plaintiffs for the production and sale of oil from the Panther and Beagle wells. In May 2013 Zavanna began drilling thirteen additional Bakken wells on or pooled with the Shae lease property.

[¶ 6] After learning of the Rolfstad well's most recent lapse in production from December 2010 through February 2011, the Horob plaintiffs sued the defendants in November 2013, claiming the

---

1. Continental is not a party to this action. Plaintiffs sued Continental in a separate action in 2012.

Shae lease expired under the cessation of production clause as early as 2004 because oil production lapsed for at least 60 consecutive days and drilling or reworking operations were not commenced. Defendants moved for summary judgment, arguing the cessation of production clause was not triggered because Continental timely restored production to the well without needing to commence additional drilling or reworking operations. Defendants also argued the lease remained in effect under the terms of the communitization agreement, and the Horob plaintiffs ratified the lease by accepting royalty payments after the lapses in production.

[¶ 7] The district court granted the defendants' motions for summary judgment concluding the Shae lease remained in effect because the cessation of production clause was not triggered. The court alternatively concluded the lease remained in effect under the communitization agreement and because the Horob plaintiffs ratified the lease by accepting royalty payments after the lapses in production.

## II

[¶ 8] The Horob plaintiffs argue the district court erred in granting summary judgment to the defendants. This Court's standard for reviewing summary judgment is established:

"Summary judgment is a procedural device for the prompt resolution of a controversy on the merits without a trial if there are no genuine issues of material fact or inferences that can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. A party moving for summary judgment has the burden of showing there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. In determining whether summary judgment was

appropriately granted, we must view the evidence in the light most favorable to the party opposing the motion, and that party will be given the benefit of all favorable inferences which can reasonably be drawn from the record. On appeal, this Court decides whether the information available to the district court precluded the existence of a genuine issue of material fact and entitled the moving party to judgment as a matter of law. Whether the district court properly granted summary judgment is a question of law which we review de novo on the entire record."

*Poppe v. Stockert*, 2015 ND 252, ¶ 4, 870 N.W.2d 187 (quoting *Johnson v. Shield*, 2015 ND 200, ¶ 6, 868 N.W.2d 368) (citations omitted).

## III

[¶ 9] The Horob plaintiffs argue the Shae lease expired under the cessation of production clause because production from the Rolfstad well ceased and additional drilling or reworking operations were not commenced within 60 days of the cessation. The district court concluded the lease did not expire because the cessation of production clause was not triggered. The court alternatively concluded the lease did not expire because: (1) it remains in effect under the terms of a communitization agreement with the United States; and (2) the Horob plaintiffs ratified the lease by accepting royalty payments after the lapses in production. We conclude the Shae lease's cessation of production clause was triggered, however, the lease remains in effect under the terms of the communitization agreement.

### A

[¶ 10] "Contracts, including oil and gas leases, are interpreted to give effect to the parties' mutual intent at the

time of contracting." *Tank v. Citation Oil & Gas Corp.*, 2014 ND 123, ¶ 10, 848 N.W.2d 691; *see also* N.D.C.C. § 9–07–03. The parties' intent is ascertained from the writing alone if possible. N.D.C.C. § 9–07–04. "The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity." N.D.C.C. § 9–07–02. "Interpretation of a written contract to determine its legal effect is a question of law, fully reviewable on appeal." *Kittleson v. Grynberg Petroleum Co.*, 2016 ND 44, ¶ 10, 876 N.W.2d 443. This case involves two contracts, the Shae lease and the communitization agreement.

[¶ 11] The district court concluded each lapse in production was temporary and the Shae lease's cessation of production clause was not triggered because Continental restored production to the Rolfstad well without commencing drilling or reworking operations after each lapse in production. The court held that Continental had a reasonable time to conduct maintenance to restore production to the well after each lapse in production. We disagree.

[¶ 12] The district court's analysis appeared to rely on three cases in concluding that a temporary cessation of production will not automatically terminate a lease and that Continental had a reasonable time to conduct maintenance to restore production to the well. *See Greenfield v. Thill*, 521 N.W.2d 87, 89 (N.D.1994); *Sorum v. Schwartz*, 344 N.W.2d 73, 76 (N.D.1984); *Feland v. Placid Oil Co.*, 171 N.W.2d 829, 833 (N.D.1969). The court's analysis on this issue is flawed. Those cases discussed the doctrine of temporary cessation and held a temporary cessation of production will not automatically terminate a lease. *Greenfield*, at 89; *Sorum*, at 76; *Feland*, at 833. Under principles of equity, the lease operator generally is "allowed a reasonable time to bring the lease back into production." *Sorum*, at 76. The leases at issue in those cases did not include a cessation of production clause like the Shae lease.

[¶ 13] This Court discussed a cessation of production clause in *Serhienko v. Kiker*, 392 N.W.2d 808, 810 (N.D.1986). The cessation of production clause in *Serhienko* had nearly identical language to the Shae lease's clause and stated, "if after discovery of oil or gas production thereafter should cease for any cause, this lease shall not terminate if lessee commences additional drilling or reworking operations within sixty (60) days thereafter[.]" *Id.* We described the cessation of production clause as an "unless" clause. *Id.* at 811. "An 'unless' clause does not obligate the lessee to do an act but provides that the lease shall terminate unless the lessee does some act." *Id.* An "unless" clause is "a clause of special limitation and a failure to comply with its terms results in the automatic termination of the lease." *Id.* at 812.

[¶ 14] The plain language of the Shae lease, similar to the *Serhienko* lease, states that if production ceases *for any cause*, the lease will terminate unless the lessee begins additional drilling or reworking operations within sixty (60) days after production ceases. *See Serhienko*, 392 N.W.2d at 810–12 (emphasis added). Other jurisdictions have held the doctrine of temporary cessation does not apply if a lease contains a cessation of production clause. *See Bedore v. Ranch Oil Co.*, 282 Neb. 553, 805 N.W.2d 68, 82 (2011) ("Where the parties have bargained for and agreed on a time period for a temporary cessation clause, the agreed-on time period will control over the common-law doctrine of temporary cessation allowing a 'reasonable time' for resumption of drilling operations."); *Welsch v. Trivestco Energy Co.*, 43 Kan. App.2d 16, 221 P.3d 609, 616 (2009) (tem-

porary cessation doctrine "cannot be applied where the parties have expressly contracted for a particular result in the event of production cessation"); *Moore v. Jet Stream Invs., Ltd.*, 261 S.W.3d 412, 425 (Tex.App.2008) (temporary cessation doctrine did not apply because the lease at issue contained explicit language limiting the cessation of production to a specific time period); *Hoyt v. Continental Oil Co.*, 606 P.2d 560, 563–64 (Okla.1980); *Greer v. Salmon*, 82 N.M. 245, 479 P.2d 294, 296–97 (1970).

[¶ 15] We agree with the reasoning of the authorities cited above and conclude the district court erred in deciding the Shae lease's cessation of production clause was not triggered. The court erred in applying the temporary cessation doctrine instead of the specific cessation of production clause.

[¶ 16] Here, under the Shae lease's cessation of production clause, the lease terminates after a cessation of production unless Continental begins drilling or reworking operations within 60 days of the cessation. It is undisputed that production from the Rolfstad well ceased from April 2004 to September 2004. Thus, the Shae lease would terminate under its cessation of production clause unless Continental began drilling or reworking operations within 60 days of the cessation.

[¶ 17] This Court discussed "reworking" in *Serhienko*, 392 N.W.2d at 812–13. The record indicates Continental undertook some activities to restore production to the Rolfstad well. For purposes of summary judgment the parties agreed these activities were not drilling or reworking operations. Accepting without deciding the parties' acknowledgment that Continental did not commence additional drilling or reworking operations within 60 days after the first cessation of production in 2004, the Shae lease would have termi-

nated under the cessation of production clause. However, as discussed below, the lease remains in effect under the communitization agreement with the United States.

## B

[¶ 18] Communitization is synonymous with pooling where federal or Indian lands are involved. 1 B. Kramer & P. Martin, *The Law of Pooling and Unitization* § 16, p. 16–1 (3rd ed.2015). Under the Mineral Leasing Act of 1920, 30 U.S.C. § 226(m) (2012), the Secretary of the Interior has authority to approve the execution of a communitization agreement to pool federal leases with other lands, whether or not owned by the United States. Production under a communitization agreement is deemed production as to each such lease committed to the agreement. *Id.*

[¶ 19] Here, the 1987 communitization agreement between Wiser and the United States committed 40 gross acres of the Shae lease to a 160–acre communitized area. The communitized area includes the Rolfstad well. The agreement states it will remain in force for two years and for so long as oil or gas are, or can be, produced from the communitized area. The agreement states "production pursuant to this agreement shall be deemed to be ... production as to each lease committed hereto." Similar to the Shae lease, the agreement contains a cessation of production clause: "This agreement shall not terminate upon cessation of production if, within sixty (60) days thereafter, reworking or drilling operations on the communitized area are commenced and are thereafter conducted with reasonable diligence during the period of nonproduction." The agreement also provides that "[e]xcept as herein modified and changed, the oil and gas leases subject to this agreement shall remain in full force and effect as originally made and issued."

[¶ 20]   The Horob plaintiffs argue they are not bound by the communitization agreement because they were not parties to the contract.   Under the terms of the Shae lease, however, the lessee is "granted the right to pool … this lease, the land covered by it or any part thereof with any other land, lease, leases, mineral estates or parts thereof for the production of oil, gas, or any other minerals."   The pooling clause of the lease also states that "production on any part of the pooled acreage shall be treated as if … such production was from the land described in this lease whether the well or wells be located on the land covered by this lease or not."   Under these terms, Wiser had authority under the lease to enter into the communitization agreement and the Horob plaintiffs are bound by the agreement.

[¶ 21]   The Shae lease and the communitization agreement contain similar cessation of production clauses stating the lease or the agreement will terminate upon a cessation of production unless the lessee or operator commences reworking or drilling operations within 60 days of the cessation. The parties acknowledge Continental did not begin reworking or drilling operations within 60 days after production ceased from the Rolfstad well in 2004.   Under the communitization agreement's cessation of production clause, the 60–day period begins to run upon receipt of notice from an authorized officer directing the lessee or operator to place the well back on production.   43 C.F.R. § 3107.2–3 (2015).   The communitization agreement modified the Shae lease by stating when the 60–day period begins to run after a lapse in production.   Continental received notice from the United States Department of the Interior's Bureau of Land Management (BLM) on August 30, 2004, directing Continental to place the Rolfstad well back on production within 60 days to prevent termination of the communitization agreement.   In re-

sponse Continental sent a sundry notice to BLM indicating the Rolfstad well was returned to production on September 10, 2004.   The record does not show Continental received notices from BLM after the Rolfstad well's subsequent cessations of production in 2007 and 2011.   Because Continental complied with BLM's directive to restore production in 2004, the Shae lease did not terminate and remains in effect under the communitization agreement.

[¶ 22]   The Horob plaintiffs argue in the alternative the Shae lease remains in effect under the communitization agreement only as to the lease's 40 gross acres committed to the agreement.   They cite a portion of 30 U.S.C. § 226(m) (2012) stating "Any lease … committed to any such plan embracing lands that are in part within and in part outside of the area covered by any such plan shall be segregated into separate leases as to the lands committed and the lands not committed as of the effective date of unitization."

[¶ 23]   Although the statute states any lease outside of a plan will be segregated into a separate lease, this provision appears to apply only to federal leases that are part of a unit plan or agreement, which is distinguished from a communitization agreement.   Under a communitization agreement leases or portions of leases are pooled to conform with state spacing unit laws.   30 U.S.C. § 226(m) (2012); 30 U.S.C. § 1017(e) (2012); 43 C.F.R. § 3217.11 (2015).   Under a unit agreement, lessees unite with other lessees to cooperatively develop or operate a particular oil reservoir to conserve resources.   30 U.S.C. § 226(m) (2012); 30 U.S.C. § 1017(a)(1) (2012); 43 C.F.R. § 3217.10 (2015); *see also* 43 C.F.R. § 3210.10 (2015) (stating lease segregation occurs when "[a] portion of a lease is committed to a unit agreement while other portions are not

committed"); Robert P. Hill, *Federal Onshore Oil and Gas Pooling and Unitization II*, 26A Rocky Mountain Mineral Law Institute 15A, 3.1.2 (1990) ("Neither the terms of the model form communitization agreement nor the underlying federal regulations cause lease segregation upon commitment of only a portion of the lands covered by a [non-federal] lease to a federal communitization agreement."). Paragraph 18(g) of the model unit agreement states in part:

"The segregation of any Federal lease committed to this agreement is governed by the following provision in the fourth paragraph of sec. 17(m) of the Mineral Leasing Act, as amended by the Act of September 2, 1960 (74 Stat. 781–784) (30 U.S.C. 226(m)):

" 'Any [Federal] lease heretofore or hereafter committed to any such [unit] plan embracing lands that are in part within and in part outside of the area covered by any such plan shall be segregated into separate leases as to the lands committed and the lands not committed as of the effective date of unitization: *Provided, however,* That any such lease as to the nonunitized portion shall continue in force and effect for the term thereof but for not less than two years from the date of such segregation and so long thereafter as oil or gas is produced in paying quantities.' "

43 C.F.R. § 3186.1 (2015). The model unit agreement also includes an optional paragraph 18(h) allowing for the segregation of non-federal leases having only a portion of its land committed to the unit agreement. *Id.* The Horob plaintiffs have not provided, nor have we found, any authority stating a non-federal lease having only a portion of its land committed to a federal communitization agreement will be segregated.

[¶ 24] In *Egeland v. Continental Res., Inc.*, 2000 ND 169, ¶ 16, 616 N.W.2d 861, this Court discussed severability of oil and gas leases and the effect of governmental pooling:

"The general rule is an oil and gas lease is indivisible by its nature. *See Shown v. Getty Oil Co.*, 645 S.W.2d 555, 560 (Tex.Ct.App.1982). Ordinarily, production from, or other operations on, any part of the land included in an oil and gas lease will perpetuate the lease beyond the primary term as to all of the land covered by the lease. *See SMK Energy Corp. v. Westchester Gas Co.*, 705 S.W.2d 174, 176 (Tex.Ct.App.1985). This situation becomes complicated by a government authority's creation of units which encompass acreage comprised of portions of several different leaseholds. *See Rougon v. Chevron, U.S.A. Inc.*, 575 F.Supp. 95, 98 (M.D.La.1983). The majority rule is governmental pooling and unitization orders do not divide a lease, and production anywhere on the pooled acreage holds all leases that may be wholly or partly in the unit. *See Mesa Petroleum Co. v. Scheib*, 726 F.2d 614, 615 (10th Cir.1984). *See also* N.D.C.C. § 38–08–08(1) ('Operations incident to the drilling of a well upon any portion of a spacing unit covered by a pooling order must be deemed, for all purposes, the conduct of such operations upon each separately owned tract in the drilling unit by the several owners thereof.') In other words, "[a] principal effect of the pooling or the unitization of a lease in most states is to preserve the entire lease even if only a portion, however small, of the lease is included in the unit." 1 B. Kramer & P. Martin, *The Law of Pooling and Unitization* § 9.01, p. 9–1 (3rd ed. 1999) ('*Pooling and Unitization*'). Pooling and unitization can therefore produce undesirable legal consequences for the lessor, whose royalty interest can be diluted by inclusion of only a portion of his leased land in a unit

with land held by other interests. *See Will–Drill Resources, Inc. v. Huggs Inc.*, 738 So.2d 1196, 1200 (La.Ct.App. 1999)."

*Egeland* also discussed how the inclusion of a Pugh clause into a lease can sever the non-pooled portion of the lease and " 'protect the lessor from the anomaly of having the entire property held under a lease by production from a very small portion[.]' " 2000 ND 169, ¶ 17, 616 N.W.2d 861 (quoting *Sandefer Oil & Gas, Inc. v. Duhon*, 961 F.2d 1207, 1209 (5th Cir.1992).)

[¶ 25] The Wyoming Supreme Court addressed a similar situation in *Wolff v. Belco Development Corp.*, 736 P.2d 730 (Wyo.1987). In *Wolff*, the lessor executed a federal communitization agreement committing 40 of 803 acres to an 80–acre communitized area. *Id.* at 731. The agreement stated production under the agreement is deemed to be production as to each lease committed to the agreement. *Id.* at 732. Production was obtained under the agreement and lessor received royalties. *Id.* Lessor later sued to quiet title to the portion of the lands included in the lease but not committed to the agreement. *Id.* Lessor argued "production on the communitized area should not be considered to be production on the remainder of the leased acreage and therefore, with respect to that remaining acreage, the lease had expired." *Id.* Under principles of contract law, the Court held "[t]he written terms of the [agreement] . . . constitute a clear and unambiguous expression of the parties' intent that production on the communitized area would hold the entire leased acreage." *Id.* at 733.

[¶ 26] Here, the pooling clause of the Shae lease states "production on any part of the pooled acreage shall be treated as if . . . such production was from the land described in this lease." The communitization agreement states "production pursu-

ant to this agreement shall be deemed to be . . . production as to each lease committed hereto." The lease does not contain a Pugh clause allowing for severability of the non-communitized portion of the lease. Therefore, the entire Shae lease remains in effect under the communitization agreement.

## IV

[¶ 27] Because the entire Shae lease remains in effect under the communitization agreement, it is not necessary to address whether the lease remains in effect because the Horob plaintiffs accepted royalties after each cessation of production. The summary judgment is affirmed.

[¶ 28] GERALD W. VANDE WALLE, C.J., BENNY A. GRAFF, S.J., DANN E. GREENWOOD, D.J. and LISA FAIR McEVERS, J., concur.

[¶ 29] The Honorable BENNY A. GRAFF, S.J., and the Honorable DANN E. GREENWOOD, D.J., sitting in place of SANDSTROM, J., and KAPSNER, J., disqualified.