# IN THE SUPREME COURT
## STATE OF NORTH DAKOTA

### 2023 ND 142

Zavanna, LLC,                                                    Plaintiff and Appellee

 v.

GADECO, LLC; Continental Resources, Inc.;          Defendants and Appellants

 and

all other persons unknown claiming any
estate or interest in, or line or encumbrance
upon, the property described in the Complaint;                        Defendants

### No. 20220265

Appeal from the District Court of Williams County, Northwest Judicial District, the Honorable Joshua B. Rustad, Judge.

AFFIRMED.

Opinion of the Court by Tufte, Justice.

Deva A. Solomon (argued), Amber M. Moore (on brief), and David R. Little (on brief), Denver, Colorado, and Nicholas C. Grant (appeared), Dickinson, North Dakota, for plaintiff and appellee.

Colleen E. McKnight (argued) and Charles M. Seely (on brief), Houston, Texas; Robert T. Slovak (on brief) and Steven C. Lockhart (appeared), Dallas, Texas; and Diane M. Wehrman (on brief), Bismarck, North Dakota, for defendant and appellant GADECO, LLC.

James E. Dallner (argued), Parker, Colorado, and Phillip S. Lorenzo (on brief), Denver, Colorado, for defendant and appellant Continental Resources, Inc.

**Tufte, Justice.**

[¶1] GADECO, LLC, and Continental Resources, Inc. (together, "Defendants") appeal from a judgment quieting title in oil and gas leasehold interests in Zavanna, LLC. We affirm, concluding the district court did not err in concluding Defendants' leases terminated under their terms when production ceased and Defendants failed to timely commence reworking operations, and in concluding Defendants failed to show a force majeure condition saved the leases from termination.

I

[¶2] Zavanna and the Defendants make competing claims to oil and gas leasehold interests covering 1,280 gross acres in Williams County. These interests are located in the Golden Unit. The Golden Well is the only well producing oil and gas from the subject leasehold within the Golden Unit. GADECO is the operator of the Golden Well. Zavanna is the lessee by assignment of the "Top Leases"[1] and GADECO and Continental are the lessees of the "Bottom Leases." The Top Leases and Bottom Leases cover the same lands and leasehold interests. The Bottom Leases consist of five sets of leases sharing common text: Grynberg Leases, GADECO Leases, Diamond Leases, Parke Energy Leases, and Continental Leases. GADECO owns all of the Bottom Leases with the exception of the Continental Leases, which are owned by Continental. Each Bottom Lease establishes a primary term and specifies that the lease will extend into a secondary term "as long thereafter as" oil or gas is produced. All of the Bottom Leases extended into secondary terms.

[¶3] The Bottom Leases automatically terminate upon cessation of production unless certain express conditions are met. The Bottom Leases state

---

[1] A "top lease" is "a lease granted by a landowner during the existence of a recorded mineral lease which is to become effective if and when the existing lease expires or is terminated." *Valentina Williston, LLC v. Gadeco, LLC*, 2016 ND 84, ¶ 3, 878 N.W.2d 397.

that a cessation of production after the lease's primary term shall not terminate the lease if the lessee restores production or commences additional drilling or reworking operations within 90 days (or 120 days in the case of the Parke Energy Leases) from the date of cessation of production.

[¶4] After a bench trial, the district court quieted title in Zavanna, concluding the Bottom Leases terminated by their own terms when production ceased and GADECO failed to timely commence drilling or reworking operations. The court found three periods of production cessation. The court concluded Defendants bore the burden to prove that production did not cease or reworking operations were timely commenced. Alternatively, the court concluded that in the event the burden is on Zavanna, Zavanna satisfied its burden of proof. Last, the court concluded the force majeure clauses in the Bottom Leases did not apply to excuse the Defendants' obligations under the leases.

## II

[¶5] "In an appeal from a bench trial, the district court's findings of fact are reviewed under the clearly erroneous standard of review, and its conclusions of law are fully reviewable." *Larson v. Tonneson*, 2019 ND 230, ¶ 10, 933 N.W.2d 84. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, after reviewing all of the evidence, we are convinced a mistake has been made. *Id.* The court's findings are presumptively correct. *Id.* "[T]he district court is the determiner of credibility issues and we will not second-guess the district court on its credibility determinations." *Id.*

## III

[¶6] Defendants argue the district court erred in concluding they bore the burden of proving production did not cease and reworking operations were timely commenced. In concluding Defendants bore the burden, the district court relied upon N.D.C.C. § 32-17-10, which provides, "A defendant interposing a counterclaim for purposes of trial shall be deemed plaintiff, and the plaintiff and codefendants against whom relief is sought shall be deemed

defendants as to the counterclaiming defendant." *See also Tavis v. Higgins*, 157 N.W.2d 718, 724 (N.D. 1968) ("Where a defendant in an action to quiet title claims to be the owner of the property and seeks to have title quieted in him, he has the burden of proving the allegations of his claim and, in effect, becomes a party plaintiff."). The court's reliance on this statute is misplaced. Section 32-17-10, N.D.C.C., merely states that when a defendant brings a counterclaim, the defendant is deemed a plaintiff with respect to its counterclaim. Of course, the statute does not shift the burden of proof to the defendant with respect to the plaintiff's claims. Rather, "[i]n an action to quiet title to real property the plaintiff must rely on the strength of his own title." *Robertson v. Brown*, 25 N.W.2d 781, 785 (N.D. 1947); *see also Hebden v. Bina*, 116 N.W. 85, 85, Syl. 1 (N.D. 1908) ("In an action to determine adverse claims to real property, it is incumbent upon plaintiff to establish his title to the property as alleged by him.").

[¶7] Zavanna sued Defendants to quiet title under its Top Leases, and Defendants counterclaimed to quiet title under their Bottom Leases. The district court rejected Defendants' quiet title counterclaims, and Defendants do not appeal from that determination. Accordingly, the only remaining claims at issue are Zavanna's quiet title claims. In order for the court to quiet title in Zavanna, the Bottom Leases must have terminated. Zavanna argues Defendants must prove their leases remain in effect. Zavanna cites no statute or case law stating a defendant-lessee must prove its leases remain in effect in order to defeat a quiet title claim that depends on termination of the lease.

[¶8] Generally, it is the burden of the party requesting cancellation or termination of a contract that must prove the contract is no longer valid or in effect. Just as the court does not presume the terms of a contract have been breached, *WFND, LLC v. Fargo Marc, LLC*, 2007 ND 67, ¶ 13, 730 N.W.2d 841, the court also does not presume a contract has been terminated under its own terms. The party claiming the contract terminated by its own terms is the party that bears the burden to prove the facts necessary to support that claim. *Sorum v. Schwartz*, 411 N.W.2d 652, 654 (N.D. 1987). As the plaintiff, Zavanna bears the burden of proof on its quiet title claims, which in this case requires

3

Zavanna to prove the Bottom Leases terminated. To prove the Bottom Leases terminated, Zavanna must prove production in paying quantities ceased, and we assume without deciding that Zavanna also has the burden to prove Defendants failed to timely commence reworking operations. The burden is not on the lessees, Defendants, to prove production did not cease in order to save the lease from termination. *See BP Am. Prod. Co. v. Laddex, Ltd.*, 513 S.W.3d 476, 482 (Tex. 2017) (stating the burden to prove a lack of production is on the lessor).

[¶9] Zavanna cites *Borth v. Gulf Oil Exploration & Production Co.*, 313 N.W.2d 706, 709 (N.D. 1981), for the proposition that "the burden of preventing a lease with an 'unless' clause from terminating lies upon the lessee." "An 'unless' clause does not obligate the lessee to do an act; however, the 'unless' clause provides that the lease shall terminate unless the lessee does some act." *Id.* Thus, the burden of *preventing* a lease from terminating referred to the lessee's action or inaction under the contract. The Court did not conclude the defendant-lessee had the burden in court to prove termination. Accordingly, we conclude Zavanna bore the burden of proof on its quiet title claims.

[¶10] While the district court concluded Defendants had the burden of proof, the court concluded in the alternative that even if Zavanna has the burden of proof, Zavanna satisfied its burden. Thus, we review the court's findings and conclusions to determine whether the court erred in concluding Zavanna satisfied its burden to prove cessation of production and failure to timely commence reworking operations.

IV

[¶11] Defendants argue the district court erred in concluding their Bottom Leases terminated for lack of production and failure to timely commence reworking operations. Each Bottom Lease states that after the lease's primary term, the lease terminates if there is a cessation of oil and gas production and there are no drilling or reworking operations commenced within a specified period of time—90 days under the Grynberg, GADECO, Diamond, and Continental Leases and 120 days under the Parke Energy Leases. The court

4

found three periods of production cessation where no reworking operations were commenced within the specified period of time.

[¶12] Oil and gas leases are interpreted in the same manner as other contracts:

> Contracts, including oil and gas leases, are interpreted to give effect to the parties' mutual intent at the time of contracting. N.D.C.C. § 9-07-03. The parties' intent is ascertained from the writing alone if possible. N.D.C.C. § 9-07-04. "The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity." N.D.C.C. § 9-07-02. Words in a contract are construed in the ordinary and popular sense, unless the parties use the words in a technical sense or give the words special meaning. N.D.C.C. § 9-07-09; *Egeland* [*v. Cont'l Res., Inc.*], 2000 ND 169, ¶ 10, 616 N.W.2d 861. Technical words are interpreted as usually understood by people in the profession or business to which they relate, unless they are clearly used in a different sense. N.D.C.C. § 9-07-10. "A contract must be read and considered in its entirety so that all of its provisions are taken into consideration to determine the true intent of the parties." *Egeland*, at ¶ 10; *see also* N.D.C.C. § 9-07-06. We attempt to give effect to every clause, sentence, and provision in a contract. *Rolla v. Tank*, 2013 ND 175, ¶ 7, 837 N.W.2d 907.

*Fleck v. Missouri River Royalty Corp.*, 2015 ND 287, ¶ 8, 872 N.W.2d 329 (quoting *Tank v. Citation Oil & Gas Corp.*, 2014 ND 123, ¶ 10, 848 N.W.2d 691). "The construction of a written contract to determine its legal effect is a question of law for the court to decide, and on appeal, this Court will independently examine and construe the contract to determine if the [district] court erred in its interpretation of it." *Fleck*, at ¶ 7.

[¶13] The Continental Leases define production as "paying production under which the income from production exceeds expenses allocated to such production by the operator." Neither the parties nor the district court identified any other provision in the Bottom Leases defining production. In *Fleck*, we

5

interpreted "production" in the habendum clause[2] and savings clause[3] to mean "production in paying quantities." 2015 ND 287, ¶¶ 11, 20. Generally, to determine whether a well is producing in paying quantities, "[a] court must consider whether the well yielded a profit over operating costs over a reasonable period of time and whether a reasonable and prudent operator would continue to operate a well in the manner in which the well was operated under the relevant facts and circumstances." *Id.* at ¶ 18. "A reasonable time must be allowed for production in paying quantities in order to determine the average production of oil and gas, the cost of production, and the availability of markets." *Id.* at ¶ 14.

[¶14] Similarly, "reworking operations" is not expressly defined in the Bottom Leases.[4] In *Serhienko v. Kiker*, this Court interpreted "reworking operations" by applying definitions and standards used in other jurisdictions. 392 N.W.2d 808, 812-13 (N.D. 1986). One "often-cited, rather broad, definition" is derived from a Texas jury instruction, which defined reworking operations as "actual work or operations which have theretofore been done, being done over, and being done in good faith endeavor to cause a well to produce oil and gas or oil or gas in paying quantities as an ordinarily competent operator would do in the same or similar circumstances." *Id.* at 812 (quoting *Rogers v. Osborn*, 261 S.W.2d 311, 313-14 (Tex. 1953)). In Alabama, "[t]he crucial test which must be met for an activity to constitute reworking is whether the operation is associated or connected with the physical site of the well or unit. Additionally, the operation must be intimately connected with the resolution of whatever physical difficulty caused the well to cease production." *Id.* at 812-13 (quoting *Sheffield v. Exxon Corp.*, 424 So.2d 1297, 1303 (Ala. 1982)). "[O]perations or activities which are not designed to revitalize a well, or to restore lost

---

[2] A habendum clause sets forth the duration of the lessee's interest in the premises. *Egeland*, 2000 ND 169, ¶ 3 n.1.

[3] A savings clause in an oil and gas lease prevents the lease from terminating if a certain condition is met. *See Fleck*, 2015 ND 287, ¶¶ 19-21.

[4] As the district court notes, "operations" and "drilling operations" are defined in several of the Bottom Leases. "Reworking" or "reworking operations," on the other hand, are not defined in the leases.

6

production, do not constitute reworking." *Serhienko*, at 813 (quoting *Sheffield*, at 1303).

[¶15] In construing "reworking operations," certain well-established guidelines have emerged from the case law:

> While it is clear that routine maintenance procedures, such as the periodic starting of the pump on the lease to keep it in running operation, do not constitute reworking operations, testing and other essential preparatory steps conducted on the well site and directly related to resolving the difficulty can constitute under certain circumstances the commencement of reworking operations. However, inherent within the concept of "reworking operations" is a duty to continue operations with due diligence after "commencement;" the activities must be conducted in a bona fide effort to restore the well to production as soon as possible. In other words, minimal preparatory steps taken within the [reworking] period followed by a lengthy period of inaction would not constitute the "commencement" of reworking operations.
>
> Furthermore, a lessee's intent to continue reworking operations after commencement must be unqualified, and not dependent upon the happening of certain contingencies. Thus, an intent to continue operations if favorable information is gained from operations conducted on another well, or if favorable financial arrangements can be made, is not sufficient.

*Serhienko*, 392 N.W.2d at 813 (citations omitted).

A

[¶16] The district court found the Golden Well ceased production by July 14, 2014, and GADECO did not commence reworking operations until December 4, 2014, when a workover rig arrived at the Golden Well (143 days later). The court found that the electric submersible pump (ESP) in the Golden Well failed and "the only way to restore production to the Golden Well required GADECO, as operator, to arrange for a workover or similar rig to pull the failed ESP out of the Golden Well and replace the failed ESP with a new mechanism of artificial lift." The court found the Grynberg, GADECO, Diamond, and Parke

Energy Leases terminated in this first cessation period. The Continental Leases were still in their primary term and thus did not terminate in gap period 1. GADECO concedes that production ceased for over 120 days during this period, but it argues the leases did not terminate because it commenced reworking operations within 90 days of production cessation. Specifically, GADECO contends that it commenced reworking operations by diagnosing the failure, assisting the service provider Baker Hughes in designing the replacement ESP, and ordering the replacement ESP from Baker Hughes.

[¶17] The district court found that prior to the workover rig being on site, GADECO had no activities connected with the physical site of the Golden Well or with resolving the physical difficulty that caused the well to cease production (i.e., removing and replacing the ESP). The court also found that GADECO did not continue its activities with due diligence after commencement. The court found GADECO's own records indicate it was aware of the ESP failure by at least August 1, 2014, but GADECO did not order the ESP until, at earliest, the end of October 2014 (three and one-half months after production ceased). The court found the average workover of a Bakken well should take only four or five days. The court further found that GADECO was not making a bona fide effort to begin reworking operations or restore production. The court found the Golden Well did not return to regular production until the end of February 2015 (over seven months after cessation). The court found GADECO was waiting on favorable financial arrangements to rework the Golden Well, noting that February 2015 is when the Golden Well was connected to a gas pipeline, allowing GADECO to avoid paying taxes and royalties on gas that would have been flared had production been restored prior to installation of the pipeline.

[¶18] We conclude the district court's findings are not clearly erroneous. GADECO fails to show that these findings are induced by an erroneous view of the law or that there is no evidence to support them. Nor are we convinced a mistake has been made after reviewing all of the evidence. Zavanna's expert, Monte Besler, testified that if an ESP fails due to the loss of an electrical leg, the ESP must be pulled and replaced to restore production, which requires a

8

workover rig. The court found that despite GADECO's being aware of the electrical leg loss by at least August 1, 2014, GADECO did not order the new ESP until, at earliest, the end of October 2014. The workover rig, which according to Besler's testimony is a necessary component of removing the failed ESP, did not arrive until December 4, 2014. The district court found GADECO's diagnosing the ESP failure, assisting Baker Hughes in designing the new ESP, and ordering the ESP from Baker Hughes were "minimal preparatory steps" and were not continued with the required diligent efforts to constitute commencement of reworking operations. *Serhienko*, 392 N.W.2d at 813-14. On this record, the court did not clearly err in finding GADECO did not commence reworking operations until the workover rig arrived at the well site on December 4, 2014.

[¶19] GADECO argues it commenced *drilling operations* within 120 days of production cessation when it connected the Golden Well to the gas pipeline, saving the Parke Energy Leases from termination. The Parke Energy Leases state that they will not terminate if drilling operations are commenced within 120 days after cessation of production. They further provide:

> For purposes of this lease, *"drilling operations" shall include* operations for the drilling of a new well and *operations for the reworking*, deepening or plugging back of a well or hole *or other operations conducted in an effort to establish, resume or re-establish production of oil and gas*; . . . drilling operations shall be deemed to be commenced for a new well at such time as lessee has begun the construction of the wellsite location or the road which provides access to the wellsite location; and *drilling operations shall be deemed to be commenced with respect to reworking*, deepening, plugging back *or other operations conducted in an effort to resume or re-establish production of oil and gas at such time as lessee has the requisite equipment for such operations at the wellsite*.

(Emphasis added.)

[¶20] GADECO cites case law from other jurisdictions defining "drilling" so as to include connecting to pipelines. However, because the Parke Energy Leases

expressly provide what drilling operations consist of and when drilling operations commence, we apply the plain language of the leases. The Parke Energy Leases define "drilling operations" in relevant part to mean reworking and "operations conducted in an effort to establish, resume or re-establish production." This provision speaks in terms of reworking or resuming or re-establishing production. By its plain language, "drilling operations" does not include connecting a well to a pipeline for the ease of transporting gas to market. Further, the provision states drilling operations commence when the lessee has the requisite equipment for such reworking operations at the well site. Thus, GADECO's argument that it "had equipment on the well site, physically impacting the well site to connect to the pipeline and get the gas to market" fails. The district court did not clearly err in finding "drilling operations" as provided in the Parke Energy Leases did not commence with respect to reworking or "operations conducted in an effort to resume or re-establish production" before the workover rig arrived at the site to pull the ESP.

[¶21] As a result of the finding that reworking or drilling operations did not commence within 120 days of production cessation, the district court did not err in concluding Grynberg, GADECO, Diamond, and Parke Energy Leases terminated in gap period 1.

B

[¶22] The district court found that all of the Bottom Leases terminated in gap period 2. The court found the Golden Well ceased production from November 5, 2015 to March 31, 2016 (147 days) due to another ESP failure, and no reworking operations commenced during this period. Because we conclude the Grynberg, GADECO, Diamond, and Parke Energy Leases terminated in gap period 1, we review only whether the Continental Leases terminated in gap period 2.

1

[¶23] Continental argues Zavanna failed to prove production ceased for longer than 90 days, proving at most a 59-day period of production cessation from

10

January 1, 2016 to February 29, 2016. Continental asserts the Golden Well produced 3.33 barrels of oil on November 19, 2015; 11 Mcf of gas in December 2015; and 839 barrels of oil and 522 Mcf of gas in March 2016.

[¶24] The district court, relying on the testimony from Continental's expert, found the North Dakota Industrial Commission (NDIC) records the most reliable source concerning the Golden Well production. NDIC records show the Golden Well produced 285 barrels of oil in November 2015 and 11 Mcf of gas in December 2015. In contrast, the court found the records prepared by the pumpers and others "not as reliable" because of the lack of testimony to their accuracy. The pumper reports show 287.07 barrels of oil were produced between November 1 and 5 and 3.33 barrels were produced on November 19. The court found that even if the Golden Well produced 3.33 barrels of oil on November 19 and 11 Mcf of gas in December, such production was not in paying quantities. Three barrels of oil and 11 Mcf of gas represent de minimis amounts of production over this time period, which as a matter of law does not equate to production in paying quantities or "paying production under which the income from production exceeds expenses allocated to such production by the operator," as the Continental Leases define production.

[¶25] Continental argues Zavanna failed to show production was not in paying quantities and the district court erred by not assessing production in paying quantities over a "reasonable period," citing *Tres C, LLC v. Raker Resources, LLC*, 2023 OK 13. In *Tres C*, the Oklahoma Supreme Court analyzed what time period was pertinent in determining whether a well was unprofitable so as to qualify as a cessation in production. *Id.* at ¶ 23. The trial court in *Tres C* found the oil and gas lease expired by its own terms after the well failed to produce in paying quantities in September, October, and November of 2016. *Id.* at ¶ 18. In September, the well "experienced another month of low production and unprofitability," producing "only 286 Mcf" of gas. *Id.* at ¶ 6 & n.29. October also proved to be unprofitable, which included the well "fail[ing] to produce anything on October 14th and 15th." *Id.* at ¶¶ 6, 8. The well operator was "very proactive" in addressing the "production problems" and brought the well back into operation on November 4. *Id.* at ¶ 7. "By mid-November, the [well] was

11

back to producing 20 Mcf of gas per day, which had previously been over the benchmark for profitability." *Id*. Despite this production, November also proved to be unprofitable. *Id*. at ¶ 8. On appeal, the lessee's successors-in-interest argued the 60-day savings period in the cessation of production clause does not apply "until a longer look-back period . . . demonstrates that a cessation—not merely an interruption—of profitable production has occurred." *Id*. at ¶ 24 (emphasis omitted). The Oklahoma Supreme Court agreed and reversed the trial court, concluding the cessation of production clause does not define the time period for assessing profitability. *Id*. at ¶¶ 27, 36-37. It further reasoned that the event preventing termination under the cessation of production clause—the "resum[ption of] operations for drilling a well within sixty (60) days from such cessation"—shows cessation must have been permanent, "as only a permanent cessation would require the remedy of drilling a new well." *Id*. at ¶ 34. The Oklahoma Supreme Court concluded, "Such a temporary interruption in profitable production should not trigger the 60-day time limit in the cessation-of-production clause." *Id*.

[¶26] Here, the district court found Zavanna proved a total cessation of production from November 5, 2015, until at least the end of February 2016. Unlike *Tres C*, profitability cannot seriously be contested for this period. The Golden Well produced 3 barrels of oil and 11 Mcf of gas over a period of almost four months. While a "look-back period" may be necessary in cases where it is unclear whether (profitable) production ceased, cessation of production is not genuinely at issue from November 5, 2015, until the end of February 2016. To the extent that *Tres C* would require a "look-back period" in every case, even where production ceased completely and profitability is not at issue, such is not required in North Dakota. Under North Dakota law, where profitability of the well is not at issue so as to affect when production in paying quantities ceased, cessation commences on the first day of no production and ends on the last day of no production. *See Horob v. Zavanna, LLC*, 2016 ND 168, ¶¶ 15-16, 883 N.W.2d 855. GADECO apparently recognizes this to be the case for gap period one, conceding that because production ceased for over 120 days during that period, the Court need only analyze whether reworking or drilling operations were commenced during period one. Accordingly, if a total cessation

of production exceeds the time period established in the lease's cessation of production clause, the lease terminates unless it provides conditions preventing termination (i.e., reworking operations are commenced within the time period).

[¶27] In *Horob*, the lease contained a cessation of production clause stating that if production ceases "from any cause," the lease "shall not terminate if lessee commences additional drilling or reworking operations within sixty (60) days thereafter." 2016 ND 168, ¶ 2. The well did not produce oil from April 2004 through September 2004. *Id.* at ¶ 4. We concluded the common law doctrine of temporary cessation—preventing a temporary cessation of production to automatically terminate a lease by allowing the operator a reasonable time to bring the lease back into production—did not apply where the lease contains a cessation of production clause. *Id.* at ¶¶ 14-15. We concluded the cessation of production clause was triggered. *Id.* at ¶ 15. Because it was "undisputed that production from the [ ] well ceased from April 2004 to September 2004," the lease "would terminate under its cessation of production clause unless [the operator] began drilling or reworking operations within 60 days of the cessation." *Id.* at ¶ 16. Although the lease did not terminate due to a communitization agreement, *id.* at ¶ 26, we held the cessation of production clause dictates the production cessation period, *id.* at ¶¶ 15-17.

[¶28] Accordingly, we distinguish *Tres C* from this case in that *Tres C* was concerned with measuring profitability over a reasonable period of time. In other words, *Tres C* asked whether a cessation in production in paying quantities occurred based on profitability. But, unlike here, the well in *Tres C* did not completely stop production of oil and gas for the time period stated in the cessation of production clause. When the court finds a well was not profitable for the duration provided in the cessation of production clause, an accounting period to determine profitability serves no purpose. More importantly, the cessation of production clause in the Continental Leases and our precedent require no accounting period under these circumstances. Further, the cessation of production clause in the Continental Leases state the leases shall not terminate if the lessee commences additional drilling or

13

reworking operations. Recall, the cessation of production clause in *Tres C* only allowed the lease to be saved if the lessee resumed drilling operations, which the Oklahoma Supreme Court noted is indicative of permanent cessation. Here, the Continental Leases specifically allow for reworking operations of an existing well, which is indicative of temporary cessation. Moreover, because the parties to the Continental Leases contracted for a 90-day cessation of production period in which additional drilling or reworking operations must be commenced to prevent termination, the common law temporary cessation doctrine does not apply. *Horob*, 2016 ND 168, ¶¶ 14-16.

[¶29] We conclude the district court did not clearly err in finding the total cessation of production from November 5, 2015, through February 2016, including de minimis amounts, triggered the cessation of production clause in the Continental Leases, providing GADECO, the well operator, 90 days to commence reworking operations. Because the district court did not err in finding production ceased from November 5, 2015, through February 2016, any production in March 2016 is irrelevant to the termination of the Continental Leases.

2

[¶30] Continental argues that GADECO commenced reworking operations by diagnosing and troubleshooting the ESP failure, performing water treatments, obtaining a price quote from Baker Hughes, and communicating with a contractor on a workover plan. The district court concluded that none of these activities constituted reworking operations. As to the communications with the contractor on a workover plan, the court found the evidence failed to show when any such plan was implemented. The court found these activities were not intimately connected with resolving the ESP failure at the physical site of the well. The district court did not clearly err in finding these actions are "minimal preparatory steps" which do not constitute commencement of reworking operations. *Serhienko*, 392 N.W.2d at 813.

[¶31] Further, the district court found that GADECO did not exercise due diligence or make a bona fide effort to begin reworking operations or restore

production as soon as possible. The court found that the Golden Well did not return to regular production until June 2016 (7 months after production ceased). We conclude the court did not err in finding GADECO failed to commence reworking operations within 90 days of production cessation. Thus, the Continental Leases terminated in gap period 2.

V

[¶32] GADECO argues the district court erroneously concluded the force majeure clauses in the Grynberg, GADECO, and Parke Energy Leases do not apply. A force majeure clause "allocat[es] the risk of loss if performance becomes impossible or impracticable, esp[ecially] as a result of an event or effect that the parties could not have anticipated or controlled." *Entzel v. Moritz Sport & Marine*, 2014 ND 12, ¶ 7, 841 N.W.2d 774 (second alteration in original). "What types of events constitute *force majeure* depend on the specific language included in the clause itself." *Id.* "An express *force majeure* clause in a contract must be accompanied by proof that the failure to perform was proximately caused by a contingency and that, in spite of skill, diligence, and good faith on the promisor's part, performance remains impossible or unreasonably expensive." *Id.* "A party relying on a *force majeure* clause to excuse performance bears the burden of proving that the event was beyond its control and without its fault or negligence." *Id.*

[¶33] The Grynberg Leases provide:

> This lease shall not expire, terminate or be forfeited in whole or in part nor shall Lessee be liable in damages for failure of Lessee to comply with any express or implied covenants hereunder so long as compliance therewith is hindered, delayed, prevented or interrupted by force majeure. The term "force majeure," as used herein, shall mean and include state and federal statutes, all orders, rules and regulations of any governmental body (either federal, state or municipal), fire, *storm*, flood, war, rebellion, riots, strikes, differences with workmen, acts of God, *breakage or failure of machinery or equipment, inability to obtain material or equipment or the authority to use the same (after effort in good faith)*, failure of pipelines normally used to transport or furnish

15

facilities for transportation or any other cause (whether similar or dissimilar) *beyond the reasonable control of Lessee.*

(Emphasis added.) The GADECO Leases and Parke Energy Leases allow for suspension of obligations if compliance is hindered or prevented by adverse weather or market conditions or an inability to obtain materials in the open market. GADECO argues it is excused from any delay in commencing reworking operations because of machinery or equipment failure, inability to obtain materials, and adverse weather and market conditions. Because GADECO argues adverse weather only affected cessation period three and we have concluded all of the Bottom Leases terminated by the end of period two, this alleged force majeure event is irrelevant to our decision.

[¶34] GADECO contends several experts testified that the market conditions in 2014 made it more difficult to obtain a workover rig. The court found GADECO failed to meet its burden in showing an inability to obtain materials:

> GADECO did not introduce any evidence that the alleged difficulty in obtaining equipment in Gap Period 1 or 2 could not have been anticipated by GADECO, and, despite its skill, diligence, and good faith, was impossible or unreasonably expensive. In fact, GADECO produced no witnesses who worked for GADECO during Gap Period 1 and 2 who testified that it did not anticipate needing a new ESP or that obtaining one was impossible or unreasonably expensive.

GADECO does not point to any evidence establishing what specific attempts it made to secure a workover rig, which proved unsuccessful. The fact that there was an oil boom during 2014 and equipment was generally more difficult to obtain does not excuse GADECO's lack of performance under its leases. GADECO bore the burden to prove that its ability to comply with its obligations under the leases was actually hindered or prevented by adverse market conditions or an inability to obtain materials, not just potentially or hypothetically hindered or prevented. GADECO has failed to cite any evidence showing it, specifically, was unable to obtain materials or equipment. Thus, the court did not err in concluding GADECO failed to show the force majeure

provisions concerning adverse market conditions and inability to obtain materials applied and excused its failure to commence reworking operations.

[¶35] GADECO asserts the district court's finding that the ESP failed was by itself sufficient to excuse its obligation to commence reworking operations under the force majeure clause in the Grynberg Leases. The clause, quoted in full above, includes "breakage or failure of machinery or equipment" as a force majeure event. But this item is included in a list that ends with the general wording "or any other cause (whether similar or dissimilar) beyond the reasonable control of Lessee." This clause is structured with a list of specific causes followed by a general term including all causes "beyond the reasonable control of Lessee." Because the list of causes ends this way, it is clear that each specific cause is an example of the same general category and thus every cause must be beyond the reasonable control of Lessee. Just as an equipment failure must be beyond the reasonable control of the Lessee, this clause unambiguously requires that fires, differences with workmen, and inability to obtain material or equipment are not alone sufficient but must be "beyond the reasonable control" of GADECO.

[¶36] The case law emphasizes that to establish force majeure, performance must be impossible or unreasonably expensive, despite the lessee's skill, diligence, and good faith. *Entzel*, 2014 ND 12, ¶ 7. Zavanna's expert, Besler, testified that the common industry practice for operators is to have a plan for an alternative artificial lift in place prior to an ESP failure. Concerning the first ESP failure commencing gap period one, Besler testified that GADECO likely waited longer than it should have to install a new ESP, approaching the end of its optimum use, and should have considered an alternative lift type. Continental's expert, Thomas Hohn, agreed that a prudent operator utilizing an ESP establishes a contingency plan for the eventual failure of the ESP. Hohn was not aware of any contingency plan of GADECO's in place prior to the ESP failure in July 2014, commencing gap period one. The district court found that GADECO had "no discernable alternative plan or backup ESP staged on location."

17

[¶37] We conclude there is no clear error in the district court's finding that GADECO failed to show that the ESP failure could not have been anticipated or was beyond its reasonable control so as to render performance impossible or unreasonably expensive. As stated above, the district court did not clearly err in finding that, even after the ESP failure, GADECO failed to diligently commence reworking operations. Therefore, the district court did not err in concluding the force majeure provisions concerning machinery or equipment failure did not apply and GADECO's obligation to commence reworking operations was not excused under the Grynberg Leases.

[¶38] Because GADECO failed to show a force majeure condition saved the leases from termination, all of the Bottom Leases terminated under their terms when production ceased and GADECO failed to timely commence reworking operations.

VI

[¶39] The judgment is affirmed.

[¶40] Jon J. Jensen, C.J.
     Daniel J. Crothers
     Lisa Fair McEvers
     Jerod E. Tufte
     Douglas A. Bahr